NOT PRECEDENTIAL

THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-2477
_____

LORENZO JOHNSON,
                                        Appellant
                        v.

NEAL MECHLING, SUPERINTENDENT;
COMMONWEALTH OF PENNSYLVANIA
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania

(D.C. No. 4-04-cv-01564)
District Judge:  The Honorable John E. Jones, III
_____

ARGUED SEPTEMBER 30, 2009

BEFORE: McKEE, Chief Judge, CHAGARES,
and NYGAARD, Circuit Judges.

(Filed October 4, 2011)
_____

Michael Wiseman, Esq. (Argued)
P. O. Box 120
Swarthmore, PA  19081

Amy G. Donella, Esq.
Defender Association of Philadelphia
Federal Court Division
601 Walnut Street

1

The Curtis Center, Suite 540 West
Philadelphia, PA 19106
        Counsel for Appellant


William R. Stoycos, Esq. (Argued)
Office of Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120
        Counsel for Appellee

_____

OPINION OF THE COURT
_____

NYGAARD, Circuit Judge.

Corey Walker murdered Taraja Williams. At a joint trial, Petitioner Lorenzo

Johnson was convicted as Walker's accomplice and co-conspirator in this murder.

Johnson appeals the District Court's denial of his petition for a writ of habeas corpus filed

pursuant to 28 U.S.C. § 2254. The sole question certified to us on appeal is whether the

evidence was sufficient to prove Johnson guilty of first degree murder and conspiracy to

commit murder.

I.

Because the only issue before us is the sufficiency of the evidence, we must

recount the evidence that was developed at trial in some detail. We state the facts in the

light most favorable to the Commonwealth, and will draw all reasonable inferences from

those facts in the Commonwealth's favor. *See United States v. Dent*, 149 F.3d 180, 187

(3d Cir. 1998). With this standard of review in mind, we turn to the District Court's

2

recitation and summary of the trial evidence.

The first witness to testify was Laura Davis, a patrol officer with the Harrisburg Bureau of Police. Officer Davis testified that she was on patrol in the early morning hours of December 15, 1995, when she heard a loud booming sound nearby. Officer Davis began to search for the source of the sound and encountered individuals who told her that someone had been shot in an alley between two houses on Market Street. Officer Davis then encountered a crowd of people in front of the Midnight Special bar, located on 14th and Market Streets, and an individual there indicated he heard a shot in the 1400 block of Market Street. After Officer Davis searched further, an individual waved her over to an alley between 1420 and 1422 Market Street where she discovered the body of Taraja Williams. The alley was about four feet wide and extended eight to ten feet back to a fence. The body was just inside the alley.

The next witness was Leroy Lucas, a member of the Harrisburg police department's forensics unit. When Officer Lucas arrived at the crime scene, he saw many footprints leading from the victim into the alley toward the six-foot fence and on the other side of the fence through the alley. Officer Lucas also recovered from the scene a partial shotgun with the barrel missing. The officer testified that the body of the victim lay approximately ten feet from the fence, relatively close to the sidewalk at the entrance to the alley.

Gary Miller, the son of the owner of the Midnight Special bar, testified that he was

3

working at the bar the night of December 14-15, 2005, and recalled seeing Williams and Corey Walker in the bar. He did not recall seeing Lorenzo Johnson. Miller testified that he was working when he heard the doorman yelling "you all got to take that out of here" and then went to the door where he saw Walker and Williams leaving.

Carla Brown, a friend of the victim, testified next. Brown testified that she was in the bar on the night of December 14-15, 2005, and saw Walker, Johnson, and Williams engaged in an argument. Brown could not hear what was said or who was speaking, but the argument involved "a lot of arm movements." Before long, the bouncer told them to leave. Brown followed Walker, Johnson, and Williams as they left the bar "because she wanted to know what was going on." Brown recalled that Walker was wearing a long leather coat and walked as if he had something hidden under it. The three men walked in a single-file line with Walker in the front, Williams in the middle, and Johnson in the back. Brown followed slowly behind with her hood up. Walker and Johnson did not notice her, but Williams, who knew her, did. The three men continued walking single file until they reached the alley where Walker entered first, Williams entered next, and Johnson remained at the entrance. As she approached the alley, Williams told Brown to keep going. Brown walked a few feet beyond the alley when she heard a loud boom and ran.

Brown admitted that she had been addicted to drugs and that she was high on cocaine at the time of the killing. According to Brown, the amount of drugs in her system

4

on the night of the murder, on a scale of one to ten, was a seven. She also stated that after the incident she ran to a friend's house and got high. Brown testified, however, that she had been clean for nine months and was currently employed. Brown admitted that, at the preliminary hearing, she had testified that she was drunk at the time of the incident but not on drugs. Brown testified that she did not contact police because she was scared that she would be killed. Brown admitted that, when she was first contacted by police, she told them she knew nothing about the incident. Brown also testified that although she knew who Victoria Doubs (another trial witness) was after being shown a photograph of her, she was not friends with Doubs and had never talked to Doubs about the incident.

The next witness was Aaron Dews, an in-house advisor at Visions Youth Works which was located in one of the buildings bordering the alley. Dews testified that he and another staff member heard a loud boom on the night of the incident. After first checking to see if it was the furnace, Dews looked out the window and saw two silhouettes running up the driveway away from the house. Dews stated that he could not see the two individuals in detail because there was plastic over the window.

Brian Ramsey, a friend of the victim, was the next witness. Ramsey testified that Williams was a cocaine addict who sometimes sold drugs to support his habit. He stated that he knew who Walker and Johnson were and that he had seen them together most of the time. Ramsey testified that on the night of the incident, he was selling drugs on Market Street near the Midnight Special bar. Williams was also out on Market Street

5

making runs for drug dealers that night. Ramsey first testified that, when he last saw Williams, he was moving into an alley with two individuals. On cross-examination, Ramsey corrected himself, stating that he saw three individuals with Williams, one female and two males. This testimony was consistent with the statement he gave police on the night of the incident. Ramsey testified that one of the individuals with Williams walked with a limp, so Ramsey assumed it was a "crippled guy" whom he knew to be a drug dealer. Ramsey stated he assumed Williams was in the alley to make a drug deal.

A minute after Ramsey saw Williams and the other individuals enter the alley, he heard a loud boom. After Ramsey heard the sound, he walked around the block. When he returned, he noticed Walker and Johnson among the crowd of people in front of the Midnight Special bar. Ramsey testified that Walker and Johnson seemed stunned, "like sort of maced like what happened, Taraja has been killed . . . are you serious?" Ramsey admitted that he was serving a sentence in Dauphin County Prison, that he was under the influence of cocaine on the night of the incident, and that although he was still a drug addict, he was in recovery.

The next witness was Detective Kevin Duffin of the Harrisburg Bureau of Police, who investigated the Williams murder. Detective Duffin testified that, about twelve hours later, on December 15, 1995, he was in an unmarked car when he approached three individuals in a brown Ford. The Ford sped away at a high rate of speed. Detective Duffin placed a flashing light on the roof of his car and followed the Ford. When the

6

Ford struck another car, the three occupants fled on foot. Two of the individuals were apprehended. One of them was Lorenzo Johnson, the petitioner.

The next witness, Victoria Doubs, testified that she, Walker, and Johnson were "close friends" who "ran the streets together." On December 14, 1995, Doubs, Walker, and Johnson woke up together in a house at 18th and Carnation Streets. They went out to buy some marijuana and then went to a Kentucky Fried Chicken restaurant near 14th and Market Streets. When Williams approached, Walker went over to talk to him and the two of them walked back toward Johnson and Doubs. Doubs testified that Walker and Williams "were talking about the money that Taraja [Williams] had owed us." Walker continued to confront Williams about the money. Williams "started getting smart," began "cussing out" Walker, and told "him he'd give it to him when he felt like and he ain't scared of him." Walker hit Williams and they started to fight. Williams won the fight, beating Walker with a broomstick.

Many people saw Williams beat Walker, which made Walker angry. After the fight, Walker, Johnson, and Doubs left. Doubs and others laughed at Walker and made jokes. Walker stated "I'm going to kill that crackhead. I'm going to kill that kid." Doubs testified that Walker "was hot. He was heated." Johnson was present when Walker made these statements. Walker, Johnson, and Doubs returned to the house at 18th and Carnation Streets where others were told about the fight and also made fun of Walker. This made Walker angry and he repeated that he was "going to kill that kid."

Doubs testified that she first told police that late on the night of December 14, 1995, she, Johnson, Suquan Ripply, "a guy named Cliff, and a girl named ReeRee" were on their way to New York. The next time Doubs met with police, however, she told them that she had lied and did not actually recall being in New York on the night of the murder. Doubs told police that she had made up her initial statement because "she was going to be paid to tell that story.... [M]y bail was supposed to be paid." Doubs explained that one of Walker and Johnson's friends named Larry was going to pay her to tell the story to police. Doubs stated that she went to New York with this same group "two to three times a week," but could not say that she was in New York with Johnson on December 14 or 15, 1995.

Finally, Doubs testified that sometime after Williams' death, she ran into Carla Brown and that the two of them got high together. Doubs testified that, while they were smoking crack together, Brown stated that Walker had given her a couple of crack rocks to take Williams into the alley on the night of the murder. On cross-examination, Doubs admitted that she had a conviction for forgery in connection with stolen checks. Doubs also admitted that she was in Dauphin County Prison on a robbery conviction.

Sergeant Frederick Wentling of the Pennsylvania State Police testified about the partial shotgun recovered from the crime scene. Suquan Ripply also testified. Ripply was one of the individuals who fled from Detective Duffin on December 15, 1995. Ripply first testified that he, Johnson, David Hairston, Vicki Doubs, a man named Clifton, and

8

woman named Ree-Ree left Harrisburg for New York around 4:00 p.m. on December 14, 1995 and did not return until 4:00 a.m. on December 15, 1995. Ripply admitted that he had initially told police this same story, but later told police that this story was false and that he was not in New York with Johnson on the night of the murder. On the stand, Ripply testified that his first statement was actually correct and that he told Detective Duffin "what he wanted to hear" after the detective told him he would be charged with perjury if he was lying. On re-cross examination, Ripply admitted that he made the trip to New York with Johnson many times, that he was "off with the dates" when he made his first statement to police, and was "not exactly" sure whether he was with Johnson in New York on December 14 or December 15.

Dr. Wayne Ross, a medical examiner, testified next and related that the cause of Williams' death was a shotgun wound to the chest. Eric Chambers, the bouncer at the Midnight Special bar on the night of the incident, saw Williams and others get kicked out, but did not see Johnson there that night.

The next witness, Lashawyn Jackson, was Walker's girlfriend and testified that Walker was with her in the Midnight Special bar all night on December 14-15, 1995. On cross-examination, however, Jackson was uncertain of the date that she and Walker were in the bar. Jackson also admitted that she never contacted the police to provide this information after Walker's arrest. The final witness, Clifton Germaine, was a friend of Walker and Johnson who testified that on a date he could not remember Johnson, and a

9

woman whose name he could not remember went with him to New York. Germaine did not know who Suquan Ripply or Victoria Doubs were.

## II.

Following a joint three-day jury trial in the Dauphin County Court of Common Pleas, Walker was found guilty of murder in the first degree and criminal conspiracy to commit murder. Johnson was found guilty as Walker's accomplice on the murder charge and guilty on the conspiracy charge as well. Johnson and Walker were both sentenced to mandatory life imprisonment on the murder conviction and concurrent terms of five to ten years of imprisonment on the conspiracy conviction.

In a post-trial motion to the Court of Common Pleas, Johnson challenged the Commonwealth's evidence as insufficient to convict him of homicide and conspiracy. The Common Pleas Court denied Johnson's motion, holding:

> We have reviewed the evidence as outlined above and conclude that the evidence was sufficient to sustain the verdicts. The Commonwealth presented the testimony of Carla Brown who followed the two defendants and the victim in the alley where the victim was ultimately shot. She stated that Corey Walker was walking with a limp and it looked to her as if he was concealing something under his coat. Victoria Doubs' testimony provides a motive for the defendants' attack. She stated that earlier on the day of the incident, the victim and Corey Walker had an altercation and that the victim embarrassed the defendant [Walker] in front of his friends and associates. She stated that the defendant [Walker] repeatedly remarked that he was going to kill the victim. Although both defense counsel tried to discredit this witness' testimony based on her character, prior convictions and current incarceration, it was solely within the province of the jury to determine whether her testimony was credible. Both defendants presented alibi witnesses who testified that they were not in the vicinity of the shooting at the time of incident. Suquan Ripply testified that Lorenzo Johnson was with

10

him in New York at the time of the incident and Corey Walker's girlfriend, Lashawnyn [sic] Jackson, testified that Corey was with her at the Midnight Special Bar the entire evening of the incident. Again, it was for the jury to determine whether the purported alibi defenses were meritorious.

Johnson and Walker jointly appealed.  Johnson argued that the evidence adduced at trial was insufficient as a matter of law to sustain a guilty verdict and that the verdict was against the weight of evidence.  After adopting the Common Pleas Court's recapitulation of the evidence, the Superior Court affirmed both convictions and sentences, holding:

> We conclude that sufficient evidence was presented to support the jury's verdict.  The various witnesses' statements revealed that Lorenzo Johnson, Corey Walker and the victim were arguing inside the Midnight Special bar and were told to leave.  The trio walked out, with the victim between Lorenzo Johnson and Corey Walker.  They proceeded into an alley, and a shot was heard.  Two men were observed fleeing the scene, and the victim's body was discovered in the alley.  Presented with this evidence, the jury had a sound basis upon which to conclude that a conspiracy existed between Lorenzo Johnson and Corey Walker to murder Taraja Williams.

*Commonwealth v. Johnson*, 726 A.2d 1079 (Pa. Super. Ct. 1998).  One Superior Court Judge dissented, finding the evidence against Johnson insufficient:

> I dissent from that portion of the Majority's decision which upholds the conviction of Lorenzo Johnson for first degree murder and criminal conspiracy . . . I believe that there is no direct evidence, nor can any be inferred, linking defendant Johnson to the death of Taraja Williams nor any agreement with defendant Walker which resulted in Williams' death.

*Id.*  Like the trial court, the Superior Court did not mention or analyze the elements of the offense of first-degree murder--the foregoing is the extent of its sufficiency of the evidence analysis.

11

Johnson next filed a petition for allowance of appeal with the Pennsylvania Supreme Court, again arguing that the evidence was insufficient to support his convictions and that the verdict was against the weight of the evidence. The Pennsylvania Supreme Court denied the petition without opinion. *Commonwealth v. Johnson*, 737 A.2d 741 (Pa. 1999).

Johnson petitioned for relief under Pennsylvania's Post Conviction Relief Act (PCRA), raising several grounds for relief. Following an evidentiary hearing, the Court of Common Pleas denied each of Johnson's claims and Johnson appealed to the Superior Court, reasserting the same grounds for relief. The Superior Court affirmed the denial of Johnson's PCRA petition.[1] Johnson filed a petition for allowance of appeal with the Pennsylvania Supreme Court which was denied without opinion.

After exhausting his available remedies in state court, Johnson filed a petition for a writ of habeas corpus in the United States District Court. In his petition, Johnson alleged that: (1) the evidence presented at trial was insufficient to support the guilty verdicts, thereby violating his rights to due process under *Jackson v. Virginia*, 443 U.S. 307

---

[1] While an appeal of his first PCRA petition was pending in the Superior Court, Johnson filed a second petition in the trial court, raising a claim of after-discovered evidence. An affidavit had been obtained from Brian Ramsey, one of the Commonwealth's trial witnesses. In this affidavit, Ramsey recants his trial testimony. He avers that while he told police he saw both Walker and Johnson at the scene of the crime, he really only saw Walker. Ramsey indicated that he "just assumed that since I saw Mr. Walker, that Mr. Johnson was somewhere in the midst of the crowd, but I actually never saw Mr. Johnson."

12

(1979); (2) that the Commonwealth failed to disclose the existence of a plea agreement with its trial witness, Victoria Doubs, thereby violating his rights to due process under *Brady v. Maryland*, 373 U.S. 83 (1963); and (3) that his trial counsel's performance was ineffective, violating his Sixth Amendment rights. The District Court denied relief on all three of Johnson's claims. The District Court later amended its judgment, and granted Johnson a certificate of appealability on the question of whether there was sufficient evidence to convict him of first-degree murder and conspiracy, a question we now address.

## III.

### A.

Our jurisdiction is based on 28 U.S.C. §§ 1291 and 2253. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254. Because the District Court ruled on Johnson's habeas corpus petition without conducting an evidentiary hearing, our review of the District Court's decision is plenary. *Marshall v. Hendricks*, 307 F.3d 36, 50 (3d Cir. 2002). Review of state court determinations is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified at 28 U.S.C. § 2254(d). AEDPA provides that

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable

13

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). State court application of federal law is contrary to clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Marshall*, 307 F.3d at 51 quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000) (O'Connor, J., concurring). The state court's application of federal law is unreasonable where "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413; *see also Lambert v. Blackwell*, 387 F.3d 210, 234 (3d Cir. 2004). The state court's decision must also have been objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Williams*, 529 U.S. at 409 ("Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.").

B.

Following the standard set forth in AEDPA, we must first determine whether the Pennsylvania Superior Court's denial of Johnson's adjudication of the merits of the sufficiency of the evidence claim was contrary to, or an unreasonable application of,

14

clearly established federal law.[2]  We agree with the District Court that the state court

incorporated the proper federal standard; therefore, it was not contrary to clearly

established law.  The question remains whether the Superior Court's determination that

there was sufficient evidence for a rational trier of fact to infer intent was an unreasonable

application of that federal standard.

The applicable clearly established federal standard is set out by the Supreme Court

in *Jackson v. Virginia*, 443 U.S. 307 (1979).  "The Constitution prohibits the criminal

conviction of any person except upon proof of guilt beyond a reasonable doubt" of each

element of the offense.  *Id.* at 309.  However, "a properly instructed jury may occasionally

_____

[2.]"We have interpreted § 2254(d)'s adjudication on the merits language to mean that 'when, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA . . . do not apply.'" *Holloway v. Horn*, 355 F.3d 707, 718 (3d Cir. 2004) (quoting *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001)) (additional citations omitted).  The Superior Court's opinion notes that Johnson challenges the sufficiency of the evidence and applies the correct standard of review: "in addressing a challenge to the sufficiency of the evidence, this court must view the evidence admitted at trial in the light most favorable to the Commonwealth, as verdict winner, and draw all reasonable inferences therefrom."  726 A.2d 1079.  Although the Superior Court's discussion was sparse and its analysis conclusory, we find that the Superior Court adjudicated Johnson's sufficiency claims on the merits. The Superior Court's opinion concluded that the evidence was sufficient to uphold the "verdicts" and also noted that circumstantial evidence can be sufficient to convict a defendant of first degree murder. The dissenting judge disagreed with the majority's decision which "upholds the conviction of Lorenzo Johnson for first degree murder and criminal conspiracy," clearly contemplating sufficiency claims as to both charges.  Consequently, AEDPA standards govern and we will review the sufficiency challenge to Johnson's conviction under those rubrics.

15

convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *Id.* at 317. "[W]hen such a conviction occurs in a state trial, it cannot constitutionally stand." *Id.* at 318. A reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original). This "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.[3] We look to Pennsylvania law only to establish the elements of the offense and then we turn to the federal question of whether the Superior Court was objectively unreasonable in concluding that sufficient evidence supported Johnson's convictions. *See id.* at 324 n.16.

C.

A Pennsylvania statute defines first-degree murder as an "intentional killing." 18 Pa. Con. Stat. Ann. § 2502(a). An "intentional killing" is further defined by statute as killing "by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa. Con. Stat. Ann. § 2592(d). Johnson was found guilty of

---

[3.] The Commonwealth argues that Johnson waived the issue of the sufficiency of the evidence to establish his intent to kill by not specifically raising it in the District Court. Johnson has preserved this issue. He argued to the District Court that in order to establish his intent to kill, the Commonwealth needed to show that Johnson "possessed a shared criminal intent with Walker, and that acting with such intent, he [Johnson] aided or abetted the commission or planning of the offense." Petitioner's Memorandum of Law in Support of Petition for a Writ of Habeas Corpus. We therefore reject the Commonwealth's waiver argument.

first-degree murder as an accomplice. Under Pennsylvania law, one is an accomplice if, "with the intent of promoting or facilitating the commission of the offense," he or she either "solicits such other person to commit [the crime]," or "aids or agrees or attempts to aid such other person in planning or committing [the offense]." 18 Pa. Con. Stat. Ann. § 306(c)(1)(i) and (ii); *see also Everett v. Beard*, 290 F.3d 500, 512 (3d Cir. 2002) (to find an accomplice guilty of first-degree murder, the jury must find that the accomplice shared the killer's specific intent to kill); *Commonwealth v. Cox*, 863 A.2d 536, 551 (Pa. 2004) (Commonwealth must prove beyond a reasonable doubt that the person charged as an accomplice was an active partner in the crime who shared with the principal the criminal intent necessary to convict for the underlying crime and who actively induced, encouraged or aided the principal in the commission of the underlying crime). Viewing the evidence in a light most favorable to the Commonwealth, and drawing all reasonable inferences from the evidence, we conclude that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

As we have indicated, a conviction will survive a due process challenge if the record contains sufficient evidence to permit any reasonable fact finder to conclude that Johnson, as an active partner, shared Walker's intent to kill Williams and that Johnson acted in such a way as to encourage or facilitate Williams' murder. *See Smith v. Horn*, 120 F.3d 400, 410 (3d Cir. 1997) (citing 18 Pa. Con. Stat. Ann. § 2502(a)). In cases like this, where Johnson was not the shooter, the Pennsylvania Supreme Court has noted the

17

difficulty in securing a first-degree murder conviction based solely on accomplice liability: "where the accomplice was not the shooter, proof of that shared intent generally is no easy task." *Commonwealth v. Raymond Johnson*, 966 A.2d 523, 543 (Pa. 2009).

Not surprisingly, the Commonwealth offered no direct proof of Johnson's intentions relying instead on circumstantial evidence and the inferences that can be drawn therefrom. *See, e.g., Commonwealth v. Murphy*, 844 A.2d 1228, 1238 (Pa. 2004); *Commonwealth v. Ford*, 650 A.2d 433, 437 (Pa. 1994) (specific intent to commit crime may be established through defendant's words or acts, or circumstantial evidence, considered with all reasonable inferences from that evidence). It is essential "that there be a logical and convincing connection between the facts established and the conclusion inferred." *United States v. Bycer*, 593 F.2d 549, 550 (3d Cir. 1979). Put another way, "[t]he difference between an inference and a speculation is that an inference is a reasoned deduction from the evidence, a speculation is a guess." *Commonwealth v. Konz*, 402 A.2d 692, 700 (Pa. Super. Ct. 1979). "If an inference is merely one of two or more possibilities of roughly equal appeal or probability, then the proposition has not been proven beyond reasonable doubt and the verdict is a product of speculation and conjecture." *Commonwealth v. Gruff*, 822 A.2d 773, 788 (Pa. Super. Ct. 2003).

For an inference to be reasonable, it "must flow from facts and circumstances proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable

18

doubt." *Commonwealth v. Bostick*, 958 A.2d 543, 560 (Pa. Super. Ct. 2008). That is to say, a reasonable inference is one where the fact inferred is "more likely than not to flow from the proved fact on which it is made to depend." *Commonwealth v. McFarland*, 308 A.2d 592, 594 (Pa. 1973) quoting *Turner v. United States*, 395 U.S. 398, 405 (1970). The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fail even under the limited scrutiny of appellate review. *Id.* quoting *Commonwealth v. Smith*, 956 A.2d 1029, 1035-36 (Pa. Super. Ct. 2008)). *See also Commonwealth v. Wodjak*, 466 A.2d 991, 996 (Pa. 1983) (inferences must be reasonable and establish a prima facie case of criminal culpability; anything less would rise no higher than suspicion).

When reviewing a habeas petition, we look to the "last reasoned decision" of the state courts on the petitioner's claims. *Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Here, that "last reasoned decision" on Johnson's sufficiency of the evidence claim was the Superior Court's memorandum opinion on direct appeal. In affirming Johnson's convictions, the Superior Court relied on the following evidence as proof of Johnson's intent: (1) Johnson, Walker and Williams were seen arguing in the Midnight Special bar and were told to leave the premises on the night of the murder; (2) they left the bar, with the victim walking between Walker and Johnson; (3) they proceeded to an alley and a shot was heard; (4) two individuals were seen running from the alley; and (5) the victim's body was discovered in the alley, along with a shotgun. Of course, the Commonwealth

19

may sustain its burden of proving every element of the crime beyond a reasonable doubt by relying on wholly circumstantial evidence. *Commonwealth v. Gibbs*, 981 A.2d 274, 281 (Pa. Super. Ct. 2009). However, Pennsylvania courts have instructed that when "applying the above test, the entire record must be evaluated and all evidence actually received must be considered." *Id.*

We find the record lacking in sufficient evidence to support the necessary conclusion that Johnson shared Walker's intent to murder Williams and that Johnson acted in a manner that encouraged or facilitated the murder. Viewing, as we must, the evidence in the light most favorable to the Commonwealth, such evidence does not permit any reasonable fact finder to reasonably infer Johnson's specific intent to kill Williams.

Let us be clear about the findings of fact the record does and does not support. A trier of fact could reasonably infer from these facts that Johnson and Walker shared a common intent to confront, threaten or harass Williams, but the statute requires Johnson and Walker to have a shared intent to kill Williams. Perhaps it can be speculated from this record that Johnson shared Walker's intent to kill Williams, but we do not find it reasonable to infer an element of the offense based on mere speculation. Although such speculation may be possible, it is Constitutionally insufficient to support a conviction. *See, e.g., Newman v. Metrish*, 543 F.3d 793, 796 (6th Cir. 2008), *cert denied sub nom. Metrish v. Newman*, 130 S.Ct. 1134 (2010); *Parker v. Renico*, 506 F.3d 444, 452 (6th Cir. 2007) (distinguishing reasonable speculation from sufficient evidence in finding a state

20

court's application of standard set forth in *Jackson* to be objectively unreasonable).

D.

We start with the argument in the bar on the night of the murder, mindful that a defendant's presence at the scene of the crime, mere knowledge of that crime or association with the criminal actor cannot be a basis for accomplice liability. *Commonwealth v. Murphy*, 844 A.2d 1228, 1238 (Pa. 2004). Gary Miller, the bar owner's son, did not recall Johnson being at the bar, but did recall the bar's doorman ordering Walker and the victim to leave the premises. Chambers, the doorman, recalls ejecting Williams and Walker from the bar, but testified he did not see Johnson. The Commonwealth maintains that Johnson, Walker and the victim engaged in a heated argument at a local tavern on the night of the murder. The difficulty, however, is that the lone witness to this event — Carla Brown — testified only that she "*saw*" an argument and did not "*hear*" the contents of the discussion. Brown does not testify that Johnson spoke during this argument, and indeed, does not testify that Johnson was actively involved in the argument. She demonstrated various gestures she witnessed, but did not identify who made these gestures. Brown does not affirmatively identify Johnson as even participating in the argument. Indeed, Brown's testimony tells us nothing of Johnson's actions during this argument. Without knowing the content of the argument, and whether Johnson was involved in it, Brown's testimony adds nothing on the question of intent; any inference drawn therefrom as to Johnson's intent to kill Williams would only be speculation.

21

Likewise, evidence that Johnson walked with Walker and the victim to an alley is not evidence of his specific intent to kill Williams. Brown, who also followed the three men out of the bar and down the street, testified that they walked in a "single file line." She testified that Johnson "never went in [to the alley]," but at another point in her testimony related that "they walked him in that alley." Later, in a summary of her testimony, she related that "all I know is who walked him [into] that alley and who stood in front of the alley." The Commonwealth relied on Brown's testimony that the victim was "walked" into the alley as evidence of Johnson's specific intent. If Brown had testified that Johnson actively pushed, shoved, ordered or otherwise forced the victim into the alley, or prevented him from leaving it, it would be reasonable to infer Johnson's specific intent. Brown does not so testify, nor does her testimony reasonably permit any such inference. Any inference drawn from this testimony as to Johnson's specific intent to kill is an unreasonable one.

Further, the Commonwealth relied on Brian Ramsey's opinion that Williams was "forced" into the alley as evidence of Johnson's intent. Reliance on Ramsey's testimony to establish intent is unreasonable. Brian Ramsey testified that he did not see the victim enter the alley and did not describe any physical action in his testimony that would lead to a reasonable inference that anyone "forced" the victim into the alley. Ramsey testified that

> I didn't see them go down the street with Taraja [Williams]. I saw, when I looked, Taraja was walking into the alley first, and there were two other

22

people behind him, and one was - - stayed there by the sidewalk. But, like I said, I really only glanced, you know. And after I looked, I figured he was all right, so I just turned back around.

App. at 233. Ramsey also does not identify who "forced" the victim into the alley:

Q: Were these people walking down 14th Street in a line, were they like one after the other, or were they side by side, or how were they when you saw them at the alley?
A: When I saw these people, they were on Market Street.
Q: I'm sorry, Market Street.
A: I wouldn't really say. I would say they were just – I looked, you know. One person was already – Taraja had already walked into the alley. The second person was walking in behind him.
Q: So Taraja went in first?
A: Yes.
Q: Okay.
A: So to my – I would say that he was forced in that alley.
Q: But all you saw is that he walked in there on his own?
A: Yes.

App. at 246. Ramsey contradicts himself. First he comments that the victim was forced into the alley, and then testifies that he only saw the victim walk into the alley. Although not mentioned as evidence by the Superior Court, the District Court accepted Ramsey's opinion that Williams was "forced" into the alley as fact. Here, the problem is that Ramsey's opinion is unsupported by his own testimony. Ramsey provided no facts to back up his opinion, nor did he identify who "forced" the victim into the alley. Without more, it is unreasonable to rely on this evidence to establish an inference that Johnson intended to kill Williams.[4]

---

[4] The District Court opined that "Johnson completely ignored Brown's testimony that he walked Williams into the alley and Ramsey's testimony that Williams was forced

23

The Commonwealth argues that Johnson's intent to kill can be reasonably inferred from the fact that he purposefully blocked the entrance to the alley. The District Court found this evidence to be an important inference to be drawn as to Johnson's specific intent. The difficulty is, however, that there is no record evidence indicating that Johnson blocked the entrance to this alley. There is no evidence that Williams, the victim, attempted to flee the alley and Johnson prevented him from doing so. All the evidence shows is that Johnson stopped walking at the entrance to the alley when the people he was following—Walker and Williams—entered it. Although one could speculate that Johnson stopped at the entrance to prevent Williams from escaping, such a picture of the night's events cannot be reasonably inferred from the evidence without engaging in the type of speculation prohibited by the Due Process clause.

The Superior Court lastly identified the fact that two men were seen fleeing the scene of the crime as evidence of Johnson's intent. Here, the Superior Court most likely was relying on the testimony of Aaron Dews. While working in a building bordering the alley where the murder took place, Dews heard a noise he originally thought was a furnace. After checking the furnace, Dews looked out a window and saw two people

into the alley. Further, in light of the multiple altercations with Williams that day, including the heated argument in the bar only moments before, it is certainly a rational inference that Johnson intentionally walked Williams toward the alley and the purposefully stood blocking the entrance." 541 F.Supp.2d at 674. The problem, however, is that the District Court misreads Brown's testimony. She did not testify that Johnson walked Williams into the alley or blocked his exit therefrom. Ramsey testified that the victim walked into the alley "on his own."

24

running up the driveway. He could not see anything more. This is not evidence of Johnson's specific intent to commit murder. Dews cannot identify the people who ran down the driveway, he did not witness anyone going into the driveway, he could not identify Johnson as one of the individuals in the driveway — indeed, he admitted that his view was obstructed by plastic sheeting on the window. It is not reasonable, therefore, to infer from Dews' testimony that Johnson was one of these individuals running in the driveway.

Moreover, that Johnson was in a car that fled from the police is not evidence of his intent to commit murder. Pennsylvania courts have held that flight from the scene of the crime may evidence a consciousness of guilt, "along with other proof, from which guilt may be inferred." *Commonwealth v. Bruce*, 717 A.2d 1033, 1037-38 (Pa. Super. Ct. 1998); *see also Commonwealth v. Moore*, 937 A.2d 1062, 1067 (Pa. 2007). However, "this only holds true in cases in which the other evidence of guilt consists of more than mere presence at the scene." *Commonwealth v. Hargrave*, 745 A.2d 20, 24 (Pa. Super. Ct. 2000). The Pennsylvania Supreme Court has instructed that "mere presence on the scene both immediately prior to and subsequent to the commission of a crime and flight therefrom is not sufficient evidence to prove involvement in the crime." *Commonwealth v. Goodman*, 350 A.2d 810, 811-12 (Pa. 1976). "The additional element of flight, which is as consistent with fear as with guilt, does not convert presence into proof of guilt." *Id.* at 811.

Harrisburg police detective Kevin Duffin testified that, while on patrol in an unmarked police car, he encountered another vehicle containing three African-American males. Duffin followed this vehicle until it hit another car and stopped. Duffin testified that the vehicle's occupants fled and that two of them were later apprehended ─ one of them was petitioner Johnson. Duffin, however, was not at the scene of the crime during this time, nor was Johnson fleeing the scene of the crime when he was apprehended approximately twelve hours later. Any inference that Johnson's flight from Duffin is evidence of his specific intent to kill is an unreasonable one.

Although not specifically discussed, or indeed even mentioned by the Superior Court, the Commonwealth points to testimony concerning a debt that it argues was owed to Johnson by Williams as evidence of motive, which in turn, would reasonably permit a fact finder to infer Johnson's specific intent to aid and abet Williams' murder. The problem for the Commonwealth, however, is that the state trial court specifically found that this debt was owed only to Walker, not to Johnson. Indeed, the prosecutor argued at the trial that the debt was owed only to Walker. Any inference drawn from this debt to establish Johnson's specific intent is unreasonable because it is foreclosed by the trial court's specific finding of fact that the debt was not owed to him. We accord a presumption of correctness to the state court's factual findings and the Commonwealth has presented nothing to overcome this presumption. *See Lewis v. Horn,* 581 F.3d 92, 100 (3d Cir. 2009); 28 U.S.C. § 2254(e)(1).

The District Court implied that, taken separately, the pieces of evidence presented by the Commonwealth were insufficient to convict Johnson. 541 F.Supp.2d at 674-75. We agree. However, we must view each piece of evidence as if it is connected to the whole and determine if the totality of the evidence, viewed in a light most favorable to the Commonwealth, establishes criminal intent beyond a reasonable doubt. We have done so and are convinced that the evidence produced here simply would not allow a reasonable juror to conclude beyond a reasonable doubt that Johnson intended to kill Williams. The web of evidence in this case is composed of strands of evidence that lead, more likely than not, to the conclusion that Johnson neither possessed the intent to kill Williams, nor assisted in the killing.

Nor is the evidence sufficient to support the necessary conclusion that Johnson acted in such a way that he intended to encourage, solicit, aid or facilitate Walker in killing Williams. *See* 18 Pa. Con. Stat. Ann. § 306(c)(1)(i) and (ii). The evidence simply does not permit any reasonable factfinder to find Johnson guilty on charges of aiding and abetting first degree murder as that crime is defined by Pennsylvania statute.

E.

To convict a defendant of conspiracy in Pennsylvania, the trier of fact must find three things from the evidence: "(1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another ... to engage in the crime; and (3) the defendant or one or more of the other

27

co-conspirators committed an overt act in furtherance of the agreed upon crime."

*Commonwealth v. Montalvo*, 956 A.2d 926, 932 (2008), *cert. denied*, – U.S. –, 129 S.Ct. 1989 (2009).  First-degree murder requires the specific intent to kill, and that *mens rea* is also required of accomplices and co-conspirators. *See* 18 Pa. Con. Stat. Ann. § 2502(a); *Smith v. Horn*, 120 F.3d 400, 410 (3d Cir. 1997), citing *Commonwealth v. Huffman*, 536 Pa. 196, 638 A.2d 961 (1994).

Inasmuch as we have already determined that the Commonwealth failed to produce sufficient evidence to allow a rational jury to find specific intent to kill on the first-degree murder charge, it necessarily follows that they failed to do so on the conspiracy charge as well.

IV.

The Superior Court's decision on the merits of Johnson's sufficiency challenge was an erroneous application of *Jackson*.  We must still determine, however, whether that court's decision was also "unreasonable" under AEDPA.  We have undertaken a careful and detailed review of the evidence and have made an assessment of the evidence produced for each element of the offense charged.  We have determined that there was insufficient evidence to prove Johnson's specific intent to commit murder.  The Superior Court unreasonably applied the standard governing when inferences may be relied upon to establish elements of a criminal offense beyond a reasonable doubt.  That standard requires that the inference in question must be "more likely than not to flow" from the

28

facts already established. *Leary v. United States*, 395 U.S. 6, 36 (1969). The "more likely than not standard" is well established. It cannot be satisfied here because the record simply does not allow a reasonable juror to infer that Johnson intended to kill Williams. The District Court erred by concluding that the Superior Court's decision was a reasonable application of Supreme Court precedent to the facts of this case. The Superior Court relied on speculation and unreasonable inferences when it reviewed the circumstantial evidence proffered by the Commonwealth against Johnson. Doing so was not only error, but was unreasonable because it allowed Johnson to be convicted on something less than proof of "every element of the offense" of conviction beyond a reasonable doubt. *Jackson*, 443 U.S. at 316.

## V.

The Pennsylvania Superior Court's decision affirming Johnson's conviction was an unreasonable application of the Constitutional requirement that the Commonwealth present evidence sufficient to prove every element of a crime beyond a reasonable doubt. 28 U.S.C. § 2254(d)(1); *In re Winship*, 397 U.S. 358, 365-68 (1970); *Jackson*, 443 U.S. at 319.

Accordingly, for all the reasons we have set forth above, we will reverse the District Court's order denying habeas relief and remand to that court with instructions for it to issue the writ.

29

CHAGARES, Circuit Judge, dissenting.

I agree with my learned colleagues' explanation of the legal standards in this case. However, I disagree with the majority's application of the law and I therefore respectfully dissent. I would affirm the District Court's denial of Lorenzo Johnson's petition for a writ of habeas corpus because the state courts' rejection of his sufficiency of the evidence claim was not contrary to, or an unreasonable application of, Jackson v. Virginia, 443 U.S. 307 (1979).

Viewing the evidence, as we must, in its totality and in the light most favorable to the Commonwealth, I believe the state court reasonably determined that a rational juror could infer that Johnson had a specific intent to aid Walker in murdering Taraja Williams. Weaving together the testimony of Carla Brown, Gary Miller, Jr., Victoria Doubs, Brian Ramsey, Detective Kevin Duffin, and Aaron Dews, the Commonwealth was able to paint the following picture. On the morning of December 14, 1995, Johnson and Walker, who were always together, woke up in the same house and went with Doubs to the Kentucky Fried Chicken ("KFC") near the intersection of 14th and Market Streets in Harrisburg, Pennsylvania. Per Doubs's testimony, Williams approached, and Walker went to confront him about the debt that he owed

"us."[1]

Defiant, Williams told Walker that he would get the money when Williams felt like it and that he was not scared of Walker. A fight ensued, and Williams beat Walker with a broomstick. As a result – and in Johnson's presence – Walker was laughed at and embarrassed by his peers. In response, Walker furiously and repeatedly stated – again in Johnson's presence – that he intended to kill Williams.[2]

---

[1] Emphasizing the ambiguity of Doubs's statement that Williams owed a debt to "us," Johnson argues that an inference that Williams owed a debt to Walker, Doubs, and Johnson (as opposed to only Walker and Doubs) was impermissible because the trial court made a finding that the debt was owed only to Walker. Because, he says, it was just as likely that Doubs's reference to "us" was to only herself and Walker, an inference that the debt was owed to Johnson as well is impermissible. The Commonwealth is ultimately correct in its argument, however, that the debate does not much matter: whether Williams owed money to all three or only to Doubs and Walker is beside the point because the testimony concerning the debt provided Johnson with <u>knowledge</u> of Walker's motive to kill Williams. Together with other evidence discussed in this opinion, I believe that it was reasonable for the state court to find that Johnson's intent to aid Walker can be inferred from his prior knowledge combined with his actions at the time of the murder.

[2] Given this testimony, it is perplexing that Johnson can argue that "[e]ntirely missing from the Commonwealth's proof is any evidence that [he] knew that Walker planned to kill Williams in advance of it happening." Johnson Br. 24, 30-31.

2

Upon returning to the area together later that evening, Brown saw Johnson, Walker, and Williams arguing in the Midnight Special bar.[3] After being thrown out of the bar, the three men proceeded in a single-file line down the street, with Walker in front, Williams in the middle, and Johnson in the rear. Walker was wearing a long, leather overcoat and noticeably walking like he had an object (presumably a shotgun) hidden in his overcoat. When they arrived at an alley between the buildings at 1420 and 1422 Market Street, Johnson stood outside the entrance while Walker, followed by Williams, entered the alley. There was testimony from both Brown and Ramsey that Williams did not willingly enter the alley. Upon entering the alley, Walker shot and killed Williams with a shotgun.

The aftermath of the crime is also consistent with Johnson's guilty mind. Aaron Dews testified that he saw two silhouettes running up the driveway from the direction of the alley. Although he could not make out the silhouettes' gender, from other evidence it flows more likely than not that

---

Quite to the contrary, the most logical inference from Walker's statement (in Johnson's presence) that he planned to kill Williams is that Johnson knew very well that Walker had such intentions.

[3] The majority posits that because Brown could not <u>hear</u> what was being said during the argument, no inferences may be drawn therefrom. I disagree. Certainly one may perceive individuals engaged in an argument without knowing the actual content of the argument.

3

the running silhouettes were indeed Johnson and Walker. Brown testified that she passed the alley and upon hearing the gun shot ran up Market Street and cut through another alley to get to Regina Street. Although this is the general direction that the two silhouettes were running, Brown ran through a different alley. Since Williams had been killed and Brown had run through a different alley, a logical inference existed that Johnson and Walker were the "silhouettes" that Dews saw fleeing up the driveway between the buildings at 1420 and 1422 Market Street. Johnson also fled from Detective Duffin the very next afternoon. Finally, there was testimony from Doubs that Johnson's friend attempted to bribe her into giving false alibi information to Duffin on Johnson's behalf. All of this post-offense conduct further supports the reasonableness of the state court's ultimate determination. See Commonwealth v. Harvey, 526 A.2d 330, 334 (Pa. 1987) ("It is a well-settled rule of law that if a person has reason to know he is wanted in connection with a crime, and proceeds to flee or conceal himself from the law enforcement authorities, such evasive conduct is evidence of guilt and may form a basis, in connection with other proof, from which guilt may be inferred."); Commonwealth v. Tinsley, 350 A.2d 791, 792 (Pa. 1976) (same).

Johnson has never argued that Walker lacked a specific and premeditated intent to kill Williams. The only issue – whether phrased in terms of specific intent to commit first-degree murder or specific intent to aid in the commission of first-degree murder – is Johnson's state of mind at the time of the homicide. Piecing together the constituent parts of the Commonwealth's evidence, I believe that the state court was not unreasonable in finding that a rational jury could properly infer Johnson's specific intent to aid Walker in the murder.

4

The majority is correct that although each strand of evidence need not support an inference of guilt by itself, we must consider each strand of evidence as if woven or entwined "to the whole and determine if the totality of the evidence, viewed in a light most favorable to the Commonwealth, establishes criminal intent beyond a reasonable doubt." Majority Op. 27. I believe, however, that the majority has improperly isolated certain strands of circumstantial evidence to reach its conclusion.

For instance, the majority holds that the mere fact that "Johnson walked with Walker and the victim to an alley" has no evidentiary value. Majority Op. 22. However, the testimony was that Walker, Williams, and Johnson proceeded in a single-file line down the street, with Walker in front (noticeably walking with an object concealed in his overcoat), Williams in the middle, and Johnson in the back. This, of course, occurred within hours of Johnson witnessing Williams beating Walker, resulting in embarrassment and humiliation to Walker, and Walker repeatedly stating that he intended to kill Williams. The single-file line brings to mind an "execution-style" killing, and undercuts any inference that the three might have been proceeding down the alley to do a drug deal or for some other late-night jaunt. Moreover, the manner in which they proceeded down the street demonstrates, more likely than not, that Johnson knew what was coming and was aiding Walker in escorting him and the victim to the place of execution, especially given the fact that the shooting occurred immediately upon entering the alley. Finally, the coercive nature of the single-file line is corroborated by Brian Ramsey's testimony that Williams was "forced" in the alley. Johnson's participation in the escorting helps demonstrate concert between him and Walker. I

5

believe the nature of the procession itself, in conjunction with other evidence, is helpful in demonstrating Johnson's specific intent.

In addition, the majority discounts as speculation any inference that Johnson's presence at the entrance to the alley where Walker killed Williams demonstrated Johnson's intent. Taken in isolation, Johnson's mere presence at the scene of a crime cannot be a basis for accomplice liability. See Commonwealth v. Murphy, 844 A.2d 1228, 1238 (Pa. 2004). But in conjunction with other evidence, it was certainly reasonable for the state court to find that Johnson's presence outside the alley – taken together with the evidence of his prior knowledge of Walker's intent to kill Williams, the evidence that he had just participated in an argument with Williams, and the single-file procession to the alley – could be viewed by a rational juror as standing guard outside the alley while Walker consummated the murder.[4]    See

---

[4]Whether there was a need for a lookout, or whether Johnson's effectiveness as one was only slight, however, is not the point. See Murphy, 844 A.2d at 1234 ("There must be some additional evidence that the defendant intended to aid in the commission of the underlying crime, and then did or attempted to do so. With regard to the amount of aid, it need not be substantial so long as it was offered to the principal to assist him in committing or attempting to commit the crime."). In any event, Brown's testimony strongly implies that Johnson was standing outside of the alley not by happenstance, but with a specific purpose. See Joint Appendix ("JA") 200, 203 ("But one thing for sure, they walked him in that alley. . . . All I know is who walked him in that alley and who stood in front of the alley."). She also

6

Commonwealth v. Ulatoski, 371 A.2d 186, 190 (Pa. 1977) ("[E]vidence concerning the previous relations between a defendant and a homicide victim is relevant and admissible for the purpose of proving ill will, motive, or malice. Evidence of prior occurrences in which the accused threatened, assaulted, or quarreled with the decedent may be admissible for this purpose." (footnote omitted)).  I submit that it was reasonable to conclude that Walker's stance outside the alley demonstrated both his specific intent to have Williams killed and his attempt to aid Walker in doing so.

\* \* \* \*

When considered in its totality, the evidence supports the inference that Johnson was assisting Walker in escorting Williams to the alley to be killed:  a single-file procession, immediately followed by Johnson taking a position just outside the alley, immediately followed by the murder with a shotgun, immediately followed by Johnson and Walker fleeing from the scene.  Together with the evidence concerning the trio's interactions outside the KFC and in the Midnight Special bar, I believe the ultimate inference – that Johnson acted with a specific intent to facilitate a first-degree murder – flows logically and reasonably from the evidence. Accordingly, I would hold that the state courts' rejection of

---

stated that she was scared that "they'd kill me too," further implying that Johnson and Walker were acting collectively. JA 168 (emphasis added).  Given the other evidence, it seems perfectly reasonable for one to conclude more likely than not that Johnson's not-so-fortuitous stance outside the alley was an overt attempt to aid in the crime.

7

Johnson's sufficiency of the evidence claim was not contrary to, or an unreasonable application of, <u>Jackson</u>.[5]

For the above reasons, I respectfully dissent, and would affirm the judgment of the District Court.

---

[5] Johnson did not advance separate arguments with regarding his criminal conspiracy conviction, although he did mention there was a lack of evidence "upon which a rational jury could have found that he possessed specific intent to kill, as required for the homicide or criminal conspiracy convictions." <u>See</u> Johnson Br. 4. Perhaps this was because "the 'intent' element required to be proven by the Commonwealth is the same for accomplice liability as for conspiracy." <u>Commonwealth v. Stein</u>, 585 A.2d 1048, 1050 n.6 (Pa. Super. Ct. 1991). As a result, the above discussion applies equally to Johnson's murder and conspiracy convictions.