# SUPREME COURT OF THE UNITED STATES

BRIAN COLEMAN, SUPERINTENDENT, STATE COR-
RECTIONAL INSTITUTION AT FAYETTE, ET AL.
*v.* LORENZO JOHNSON

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 11–1053.　Decided May 29, 2012

PER CURIAM.

Respondent Lorenzo Johnson was convicted as an ac-
complice and co-conspirator in the murder of Taraja Wil-
liams, who was killed by a shotgun blast to the chest in
the early morning hours of December 15, 1995, in Har-
risburg, Pennsylvania.  After his conviction was affirmed
in state court, Johnson exhausted his state remedies and
sought a writ of habeas corpus in Federal District Court
pursuant to the Antiterrorism and Effective Death Penal-
ty Act of 1996 (AEDPA), 28 U. S. C. §2254.  The District
Court denied habeas relief but the U. S. Court of Appeals
for the Third Circuit reversed, holding that the evidence
at trial was insufficient to support Johnson's conviction
under the standard set forth in *Jackson* v. *Virginia*, 443
U. S. 307 (1979).

We have made clear that *Jackson* claims face a high bar
in federal habeas proceedings because they are subject to
two layers of judicial deference.  First, on direct appeal, "it
is the responsibility of the jury—not the court—to decide
what conclusions should be drawn from evidence admitted
at trial.  A reviewing court may set aside the jury's verdict
on the ground of insufficient evidence only if no rational
trier of fact could have agreed with the jury." *Cavazos* v.
*Smith*, 565 U. S. 1, ___ (2011) *(per curiam)* (slip op., at 1).
And second, on habeas review, "a federal court may not
overturn a state court decision rejecting a sufficiency of
the evidence challenge simply because the federal court

disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico* v. *Lett*, 559 U. S. ___, ___ (2010) (slip op., at 5)).

Because the Court of Appeals failed to afford due respect to the role of the jury and the state courts of Pennsylvania, we now grant certiorari and reverse the judgment below.

\* \* \*

The parties agree that Williams was shot and killed by Corey Walker, who was subsequently convicted of first-degree murder. Johnson was with Walker on the night of the crime, and the two were tried jointly. Johnson was charged as an accomplice and co-conspirator. See 18 Pa. Cons. Stat. §2502 (2008) (defining first-degree murder as "willful, deliberate and premeditated" killing); §306(c) (imposing accomplice liability for anyone who, "with the intent of promoting or facilitating the commission of the offense . . . aids or agrees or attempts to aid such other person in planning or committing it"); *Commonwealth* v. *Montalvo*, 598 Pa. 263, 274, 956 A. 2d 926, 932 (2008) (criminal conspiracy liability for anyone who takes an overt act in furtherance of a crime he has agreed to abet or commit).

At trial, the Commonwealth called Victoria Doubs, who testified that she, Johnson, and Walker were "close friends" who "ran the streets together." Tr. 213. On the morning of December 14, the three of them awoke at the same residence, bought marijuana, and then went to a Kentucky Fried Chicken restaurant, where they encountered Williams. Walker announced that he was going to "holler at" Williams about a debt Williams owed. *Id.*, at 217. According to Doubs, Walker and Williams "were talking about the money that [Williams] had owed us," with Walker "asking [Williams], confronting him, about his money and what's up with the money and why is it

taking you so long to give us the money." *Id.*, at 217–218. Williams was "cussing [Walker] out, telling him he'd give it to him when he felt like it and he ain't scared of [Walker]." *Id.*, at 218. A fight ensued, which ended when Williams beat Walker with a broomstick in front of the crowd of people that had gathered.

After the fight, Doubs testified, Walker "was mad, because he got beat by a crackhead. . . . He was saying, yo, that crackhead beat me. I'm going to kill that crackhead. I'm going to kill that kid. . . . He was hot. He was heated." *Id.*, at 220–221. Johnson was present when Walker made these statements. Later that afternoon, Doubs recounted the beating to others, who laughed at Walker. Walker "repeated it for a while that I'm going to kill that kid. That kid must think I'm some type of joke. I'm going to kill that kid. Who he think he is[?]" *Id.*, at 222. Once again, Johnson was present for these statements.

Another witness was Carla Brown, a friend of the victim, who testified that she was at the Midnight Special Bar on the night of December 14–15, where she saw Walker, Johnson, and Williams engaged in a heated argument. Although she could not hear what they were saying, she could tell they were arguing because they were making "a lot of arm movements." *Id.,* at 104. The bouncer soon told them to leave, and Brown followed them into the street because she "wanted to know what was going on." *Ibid.* Brown observed the three men walking in a single-file line, with Walker in front, Williams in the middle, and Johnson in the back. Walker was wearing a long leather coat, walking as if he had something concealed underneath it. Brown followed the three men to an alleyway, at which point Williams recognized Brown and told her to "go ahead" and pass. *Id.,* at 107. Walker then entered the alleyway, followed by Williams, while Johnson remained standing at the entrance. As Brown walked past the alley, she heard a loud "boom," causing her to run away. *Id.,* at

143.  On cross-examination, Brown stated: "They walked [Williams] in that alley.  He stood inside the alley.  He walked him in the alley.  I heard a boom." *Ibid.*

The Commonwealth also called Aaron Dews, who testified that he was in a building bordering the alleyway at 12:45 a.m. on the morning of December 15.  He heard a loud boom that caused him to look out into the alley from his second-story window, where he saw two silhouettes fleeing.

After Dews the Commonwealth called Brian Ramsey, who had been selling cocaine on a nearby street corner at the time of the murder.  He testified that he saw Williams walking toward an alleyway with two males and a female, and he heard a loud boom shortly after Williams entered the alley.  When pressed on cross-examination, he stated: "I would say that [Williams] was forced in that alley." *Id.,* at 189.

The jury also heard testimony from police who searched the alley shortly after the murder and found a shotgun with the barrel missing.  A medical examiner who examined Williams' body testified that the cause of death was a shotgun wound to the chest.

After the jury convicted Johnson, he filed a post-trial motion arguing that the evidence was insufficient to support his conviction.  The court denied his motion, and the Pennsylvania Superior Court affirmed the conviction on direct appeal.  See *Commonwealth* v. *Johnson*, 726 A. 2d 1079 (1998).  After the Pennsylvania Supreme Court denied his petition for review, Johnson unsuccessfully sought state postconviction relief.  He then filed a habeas petition in Federal District Court, which denied his claims.  See *Johnson* v. *Mechling*, 541 F. Supp. 2d 651 (MD Pa. 2008).  Finally, Johnson appealed to the Third Circuit, which reversed the District Court and ordered his conviction overturned.

Under *Jackson*, evidence is sufficient to support a con-

viction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U. S., at 319.

In light of the testimony at Johnson's trial, the Court of Appeals acknowledged that "[a] trier of fact could reasonably infer . . . that Johnson and Walker shared a common intent to confront, threaten or harass Williams." *Johnson* v. *Mechling,* 446 Fed. Appx. 531, 540 (CA3 2011). As for the notion that "Johnson shared Walker's intent to kill Williams," however, the court concluded that was "mere speculation" that no rational factfinder could accept as true. *Ibid.* The court stated that "a reasonable inference is one where the fact inferred is 'more likely than not to flow from the proved fact on which it is made to depend.'" *Id.,* at 539–540 (quoting *Commonwealth* v. *McFarland*, 452 Pa. 435, 439, 308 A. 2d 592, 594 (1973)). In order for a jury's inferences to be permissible, the court reasoned, they must "'flow from facts and circumstances proven in the record'" that are "'of such volume and quality as to overcome the presumption of innocence.'" 446 Fed. Appx., at 539 (quoting *Commonwealth* v. *Bostick*, 958 A. 2d 543, 560 (Pa. Super. 2008)).

At the outset, we note that it was error for the Court of Appeals to look to Pennsylvania law in determining what distinguishes a reasoned inference from "mere speculation." Under *Jackson*, federal courts must look to state law for "the substantive elements of the criminal offense," 443 U. S., at 324, n. 16, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law.

Under the deferential federal standard, the approach taken by the Court of Appeals was flawed because it unduly impinged on the jury's role as factfinder. *Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring

only that jurors "draw reasonable inferences from basic facts to ultimate facts." *Id.*, at 319. This deferential standard does not permit the type of fine-grained factual parsing in which the Court of Appeals engaged. For example, in addressing Brown and Ramsey's testimony that Williams was "walked" and "forced" into the alleyway, the court objected that the witnesses did not describe any "physical action" supporting the conclusion that force was used. 446 Fed. Appx., at 541. Absent some specific testimony that "Johnson actively pushed, shoved, ordered or otherwise forced the victim into the alley, or prevented him from leaving it," *ibid.,* the court could see no reasonable basis for the jury's conclusion that Johnson had a specific intent to help kill Williams.

That analysis is flawed for two reasons. First, the coercive nature of Johnson and Walker's behavior could be inferred from other circumstances not involving the direct use of force: Walker was noticeably concealing a weapon, and he had been heatedly threatening to kill Williams after a violent confrontation earlier in the day. Johnson and Walker kept Williams between them in a single-file line on the way to the alley, where Johnson stood at the entrance while the other two entered, suggesting that Johnson may have been prepared to prevent Williams from fleeing. And second, even if Williams was not coerced into the alley, the jury still could have concluded that Johnson helped lead or lure him there to facilitate the murder.

Taken in the light most favorable to the prosecution, the trial testimony revealed that Johnson and Walker "ran the streets together," and had attempted to collect a debt from Williams earlier on the day of the murder. Williams resisted the collection, managing to humiliate Walker in the process by giving him a public thrashing with a broomstick. This enraged Walker to the point that he repeatedly declared over the course of the day in Johnson's

presence that he intended to kill Williams. Then, while Walker was noticeably concealing a bulky object under his trenchcoat, Johnson helped escort Williams into an alley, where Johnson stood at the entryway while Walker pulled out a shotgun and shot Williams in the chest.

On the basis of these facts, a rational jury could infer that Johnson knew that Walker was armed with a shotgun; knew that he intended to kill Williams; and helped usher Williams into the alleyway to meet his fate. The jury in this case was convinced, and the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality. The state court of last review did not think so, and that determination in turn is entitled to considerable deference under AEDPA, 28 U. S. C. §2254(d).

Affording due respect to the role of the jury and the state courts, we conclude that the evidence at Johnson's trial was not nearly sparse enough to sustain a due process challenge under *Jackson*. The evidence was sufficient to convict Johnson as an accomplice and a co-conspirator in the murder of Taraja Williams. The Commonwealth's petition for certiorari and the motion to proceed *in forma pauperis* are granted, the judgment of the Court of Appeals for the Third Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*