STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2019 KA 0426

STATE OF LOUISIANA

VERSUS

JAMES BOURGEOIS

Judgment Rendered: **JUN 1 7 2020**

* * * * *

Appealed from the
Seventeenth Judicial District Court
Parish of Lafourche, State of Louisiana
No. 569593

The Honorable Steven Miller, Judge Presiding

* * * * *

Kristine M. Russell
District Attorney
Joseph S. Soignet
Jason Chatagnier
Assistant District Attorneys
Thibodaux, Louisiana

Attorneys for the State of Louisiana

Thomas M. Calogero
Metairie, Louisiana

Attorneys for Defendant/Appellant,
James Bourgeois

Eric J. Santana
Metairie, Louisiana

Mark D. Plaisance
Marcus J. Plaisance
Prairieville, Louisiana

* * * * *

BEFORE: GUIDRY, WELCH, AND BURRIS,[1] JJ.

---

[1] The Honorable William J. Burris is serving as judge *pro tempore* by special appointment of the Louisiana Supreme Court.

*Welch J. dissents and assigns reasons*

*Guidry, J. Concurs in the result.*

**BURRIS, J.**

The defendant, James Bourgeois, was convicted of filing or maintaining a false public record for falsely representing his domicile on a document filed in support of his candidacy for the Lafourche Parish Council. *See* La. R.S. 14:133. The trial court imposed a suspended sentence of three years imprisonment at hard labor, with two years of probation. We reverse the conviction and vacate the sentence.

## FACTS

The Lafourche Parish Home Rule Charter requires that a candidate for the council be a qualified elector who has been domiciled in the district in which he seeks election for at least one year prior to the end of the qualifying period. On December 2, 2015, the defendant filed a notice of candidacy with the Lafourche Parish Clerk of Court's office, in which attested he was a duly qualified elector of Lafourche Parish, with a domiciliary address in Raceland, Louisiana. The procedure of the clerk's office was to record the form, transmit it to the Secretary of State's office, and file it as a permanent record.

The defendant was elected to the council in April 2016. In 2017, the District Attorney received a complaint, which it referred to the Lafourche Parish Sheriff's Office, that the defendant was not living in his district and had not been domiciled in Lafourche Parish for the year before he qualified for candidacy. It is undisputed the defendant married in 2014, and the couple maintained the home the defendant owned in Raceland and the home his wife owned in Metairie, Louisiana. The defendant was prosecuted for falsely representing on his qualifying form that his domicile was Lafourche Parish, with the state arguing the defendant's domicile changed to Jefferson Parish after his marriage.

2

## SUFFICIENCY OF THE EVIDENCE

A conviction based on insufficient evidence cannot stand, as it violates due process. *See* U.S. Const. amend. XIV; La. Const. art. I, § 2. In reviewing claims challenging the sufficiency of the evidence, an appellate court must determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt based on the entirety of the evidence, both admissible and inadmissible, viewed in the light most favorable to the prosecution. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Oliphant,* 13-2973 (La. 2/21/14), 133 So. 3d 1255, 1258 *(per curiam); see also* La. Code Crim. Pro. art. 821B; *State v. Mussall,* 523 So. 2d 1305, 1308-09 (La. 1988).

> Additionally, the Louisiana Supreme Court recently explained:

> [T]he *Jackson* standard of review does not allow a jury to speculate on the probabilities of guilt where rational jurors would necessarily entertain a reasonable doubt. *State v. Mussall,* 523 So.2d 1305, 1311 (La. 1988) (citing 2 C. Wright, *Federal Practice & Procedure, Criminal 2d,* § 467). The requirement that jurors reasonably reject the hypothesis of innocence advanced by the defendant in a case of circumstantial evidence presupposes that a rational rejection of that hypothesis is based on the evidence presented, not mere speculation. *See State v. Schwander,* 345 So.2d 1173, 1175 (La. 1977). Nonetheless, the *Jackson* standard "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson,* 566 U.S. 650, 655, 132 S.Ct. 2060, 2064, 182 L.Ed.2d 978 (2012).

*State v. Mayeux,* 19-00369 (La. 1/29/20), ___ So. 3d ___, ___ (2020WL508655, *1) *(per curiam).*

The due process standard does not require the reviewing court to determine whether it believes the witnesses or whether it believes the evidence establishes guilt beyond a reasonable doubt. *State v. Mire,* 14-2295 (La. 1/27/16), 269 So. 3d 698, 703 *(per curiam).* Rather, appellate review is limited to determining whether the facts established by the direct evidence and inferred from the circumstances

3

established by that evidence are sufficient for *any* rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Gardner*, 16-0192 (La. App. 1 Cir. 9/19/16), 204 So. 3d 265, 267. The weight given evidence is not subject to appellate review; therefore, an appellate court will not reweigh evidence to overturn a factfinder's determination of guilt. *State v. Livous*, 18-0016 (La. App. 1 Cir. 9/24/18), 259 So. 3d 1036, 1040, *writ denied*, 18-1788 (La. 4/15/19), 267 So. 3d 1130.

Louisiana Revised Statutes 14:133A defines the crime of "filing false public records," in pertinent part, as the filing or depositing for record in any public office or with any public official, with knowledge of its falsity, any document containing a false statement or false representation of a material fact. Thus, conviction requires proof beyond a reasonable doubt that (1) the defendant filed or deposited for record in any public office or with any public official, (2) a document containing a false statement or false representation of material fact, (3) with knowledge of the falsity. On appeal, the defendant argues the state failed to prove he falsely represented his domicile on the notice of candidacy he filed with the Lafourche Parish Clerk of Court.

A person's domicile is the place of his habitual residence; however, the concepts of domicile and residence are not synonymous. La. Civ. Code art. 38; *Russell v. Goldsby*, 00-2595 (La. 9/22/00), 780 So. 2d 1048, 1051 (*per curiam*). A person can have several residences, but only one domicile. *See* La. Civ. Code art. 39; *Landiak v. Richmond*, 05-0758 (La. 3/24/05), 899 So. 2d 535, 542. Domicile essentially consists of two elements—residence and an intent to remain. *Landiak*, 899 So. 2d at 542.

A person retains his domicile until he acquires a new one. La. Code Civ. Pro. art. 44. A person changes his domicile when he moves his residence to another location with the intent to make that location his habitual residence. La.

4

Civ. Code art. 44. Proof of intent to change domicile depends on the circumstances. La. Civ. Code art. 45. A party seeking to show that a person's domicile has changed must overcome the legal presumption that it has not changed by positive and satisfactory proof of establishment of a domicile as a matter of fact with the intention of remaining in the new place and of abandoning the former domicile. *Russell*, 780 So. 2d at 1051; *In re Succession of Cannata*, 14-1546 (La. App. 1 Cir. 7/10/15), 180 So. 3d 355, 361, *writ denied*, 15-1686 (La. 10/30/15), 180 So. 3d 303.

A sworn declaration of intent, recorded in the parishes from which and to which a person intends to move, may be considered as evidence of intent to change domicile. La. Civ. Code art. 45. Absent such a formal declaration, the evidence must be weighed to determine domicile in fact. *Landiak*, 899 So. 2d at 543. Circumstances indicating establishment of a domicile include where a person sleeps, takes his meals, has established his household, and surrounds himself with his family and the comforts of domestic life. *In re Succession of Cannata*, 180 So. 3d at 361. Relevant considerations include voter registration, homestead exemptions, vehicle registration records, driver's license address, statements in notarial acts, and evidence of where most of the person's property is housed. *See Landiak*, 899 So. 2d at 543-44. Domicile is therefore determined on a case-by-case basis. *See Pattan v. Fields*, 95-1936 (La. App. 1 Cir. 9/26/95), 669 So. 2d 1233, 1238 (*en banc, per curiam*), *writs denied*, 95-2381, 2382 (La. 9/29/95), 661 So. 2d 1341, 1342.

Detective Nicholas Pepper of the Lafourche Parish Sheriff's Office investigated the complaint against the defendant. He obtained a copy of the defendant's notice of candidacy that was filed with the clerk of court's office on December 2, 2015, and indicated the defendant's domicile was in Lafourche Parish. He obtained further records indicating the defendant was registered to vote

in Lafourche Parish, and owned and claimed a homestead exemption on the home in Raceland. The defendant also listed the Raceland address on his driver's license. Detective Pepper confirmed that the defendant obtained a marriage license in Jefferson Parish and married on April 5, 2014. On the marriage license, the defendant listed the home in Raceland as his address.

Detective Pepper learned the defendant frequently drove a truck; therefore, he searched the records of the Office of Motor Vehicles and discovered a 2015 Dodge truck was registered in the names of both the defendant and his wife at her address in Metairie. Detective Pepper testified he mapped the most obvious route between the two residences and utilized a license plate reader located at the parish line to review the defendant's travel patterns from August 2016 through August 2017. According to the data Detective Pepper collected, the defendant's truck crossed the parish line 380 times, typically originating eastbound from the direction of the Metairie house and traveling toward the Raceland address. Detective Pepper clarified the figure indicated the defendant crossed into Lafourche Parish at least one hundred ninety times.

Detective Pepper subsequently learned the defendant sometimes drove to Parish Council meetings in a BMW that was observed at the Metairie address. Detective Pepper testified it appeared the defendant was driving from Metairie to Raceland and switching vehicles before returning. However, Detective Pepper conceded the defendant owned several vehicles, including a Volvo that was registered at the Raceland address. Detective Pepper also conceded he did not know the purpose of the defendant's travel across the parish line.

A search warrant yielded the utility records of the defendant's Raceland address. Detective Pepper testified that approximately one month prior to the defendant's wedding, energy usage decreased to less than half what it had been. Water consumption significantly increased between November 2015 and

November 2016, and Detective Pepper's investigation revealed the water company tried to contact the defendant about a potential leak.

During the course of his investigation, Detective Pepper also learned the defendant reported a burglary at the Raceland address in August 2015, and claimed some guns had been stolen. Lieutenant Benjamin Paul Dempster investigated the complaint and testified that dozens, even hundreds, of guns were present at the residence, and the defendant claimed two had been stolen. The defendant was uncertain of the exact date of the burglary, but believed it occurred between August 5 and August 31, 2015. When asked about the condition of the house, Lieutenant Dempster stated it did not appear anyone lived there at the time, describing the yard as uncut, with grass calf to knee high, and the house as dusty, with things "packaged up." Lieutenant Dempster testified the defendant "said he wasn't living at the house for a while and was thinking about having it demolished." He could not recall if the defendant stated he planned to build a new house in its place. Detective Pepper testified the investigating officers told him the house appeared uninhabitable.

Detective Pepper testified he interviewed the defendant, who indicated he was in the military, serving as a battalion commander in the Army Reserves, and was often away. Detective Pepper made no determination of whether the defendant moved furniture out of the Raceland house or whether the defendant kept his clothes in Raceland. According to Detective Pepper, the defendant said his children lived with his new wife at the Metairie address. Detective Pepper further testified that the defendant also said he acquired a tenant at the Raceland address in 2017, who owned one of the vehicles Detective Pepper observed.

The defendant's wife, Monica Bourgeois, testified she owned the Metairie house and had lived there for 26 years. She stated she and the defendant married April 5, 2014, and separated in May 2018. After their marriage, they shared both

7

of their homes and spent time between them. However, each retained separate ownership of their home and each claimed a homestead exemption on their own home. She stated that most of the time they slept in Metairie, but they also slept in Raceland, where they hosted crawfish boils, fishing, and parties. She further stated the defendant had some belongings at the Metairie house, including clothes and memorabilia, but "[h]e never fully moved into" the Metairie house. According to Monica, the two "compromised and went back and forth to both places."

Both the defendant and his wife had children from previous relationships, and Monica's son lived at the Metairie house during alternating weeks when she exercised physical custody. Monica testified that between 2014 and 2015, the defendant's children often visited with him in Raceland. Pursuant to a consent judgment reached between the defendant and his ex-wife, the defendant's son, J.B.,[2] moved to the Metairie house and attended Archbishop Rummel High School (Rummel), located in Metairie, from August 2015 until the couple separated. The defendant's youngest daughter lived at the Metairie house and attended Archbishop Chappelle High School in Metairie from August 2017 until May 2018. However, Monica stated the children were frequently at the Raceland home, and sometimes the defendant's son was driven to school from the Raceland home. Following the couple's split, the children began attending school in Lafourche Parish.

Monica testified she and the defendant spent more nights in Metairie after the defendant's son moved into the Metairie house. She explained the defendant's presence in Metairie was further affected by his father's two-month hospital stay, which preceded his August 2015 death. Monica testified the defendant was also required to travel for military service. She testified the defendant returned from his

---

[2] To protect their privacy, the minor children are referred to by their initials. *Compare* Uniform Rules – Courts of Appeal, Rule 5-1 and 5-2.

last overseas deployment in 2011, but thereafter he was away for military service a weekend to a week each month, and had trainings and assessments at other locations. She did not recall how often the defendant traveled for military duty between 2014 and 2015, specifically. However, she agreed one of the reasons the defendant's son moved to her home in Metairie was so she could assist while the defendant was away.

Monica stated the defendant never abandoned the Raceland house and kept his furniture, belongings, and his collection of 50 to 75 M1Carbine guns there. She characterized the Raceland home as a house, not a camp, that was "in disrepair," but functional. She agreed the house became "a mess" when the defendant was deployed to Afghanistan, but testified it was not abandoned and, despite the mess, she and the defendant both slept there, and specifically did so between 2014 and 2015. She further indicated the defendant's children had belongings, including trophies, at the Raceland home, and had certificates on the walls. Monica also testified the family raised chickens at the Raceland home while one of the defendant's daughters participated in the 4-H club, which included the year 2015. She admitted she tired of the mess at the Raceland home, but maintained that the defendant never moved out of it. She explained that before their split, she and the defendant planned to build a house in Raceland and sell her house.

When asked about the truck registration, Monica explained she had a better credit score and qualified for the financing; therefore, she was the primary lender on the account and registered the vehicle in Metairie. She stated the other vehicles the defendant owned were registered in Raceland. She also indicated the defendant received all of his mail in Raceland. During her testimony, Monica identified various photographs of the defendant and his children at the Raceland home at various times, including 2015.

In June 2015, Mr. Yu Chen Wang moved to a house next door to Monica's. He testified he had seen the defendant and his children at the Metairie house, but was not sure if the defendant lived there. He could not say how often the defendant was at the Metairie house at any particular time, but stated he often saw the defendant at the Metairie house "a long time ago," but had not seen the defendant more recent to the September 2018 trial.

The defendant's ex-wife, Kristina "Kitty" Frelich, testified she and the defendant divorced in 2009, after thirteen years of marriage, and are the parents of three children. She explained they agreed to change their original custody arrangement to name the defendant J.B.'s domiciliary parent when their son asked to live with his father and attend Rummel. Kitty testified her understanding was the defendant was living in Metairie with Monica at the time. She verified that on the application for the school year beginning in August 2015, the defendant listed Monica's Metairie address as his own; however, Kitty also identified mail from the school addressed to the defendant in Raceland. She testified their youngest daughter later went to live with the defendant in Metairie to attend school.

Kitty indicated most of the custody exchanges took place in Metairie, at Monica's home. She also indicated that when the children spent holidays with their father, they were at the Metairie address. Kitty admitted, however, she had no knowledge of how frequently the defendant slept at his Raceland home. She recalled her daughter raising chickens at the Raceland home in 2013, but stated for two years she raised them at an uncle's house "because he wasn't there in Raceland." She also testified her children refused to live at the defendant's Raceland home because of its deplorable condition.

J.B., who was sixteen years old at the time of the trial, testified the Raceland home was not in the best condition, and most visitation with his father was in Metairie. He explained that he moved to the Metairie home to begin the 2015

10

school year. During that time, he recollected his father spending the night there in the room with Monica. J.B. also recalled that his father traveled frequently with the military, and while his father was away, Monica cared for him. When asked if his father lived in the Raceland house, J.B. answered that his father "slept there but not full time." J.B. could not say how many times his father slept at the Raceland home in 2015. J.B. also testified that when he attended Rummel, he was "registered in Raceland."

The defendant's adult daughter, Lauren, testified she moved into a dormitory at Tulane in 2015, and at that time her father was living with Monica in Metairie. Lauren stated visits with her father were in Metairie and recalled celebrating holidays there during 2014 and 2015. She explained she was very close to the defendant's father, who passed away in 2015, and visited him in the hospital at Ochsner every chance she could, but recalled seeing her father there only once or twice.

Lauren stated the Raceland home was in terrible condition, and stated she last visited it in June 2018, and before that had driven by but not visited her father there since 2012. Lauren did not know how many family events were held in Raceland or how much time her father spent in Raceland in 2015, indicating she did not see her father on a regular basis. She recalled driving her siblings from Metairie to their mother's house, but did not recall taking them to Raceland. Many times she picked up her siblings from school and took them to the Metairie home. She acknowledged her father did not change his address from Raceland to Metairie, but stated "he did move to Metairie," describing Raceland as a place he lived "partially." She also indicated her father moved many of his guns to Metairie, but did not know if he did so because of the burglary. She confirmed that she and her siblings had trophies at the Raceland home, but stated that "doesn't

mean anything." She further testified her sister raised the chickens at their uncle's house in 2015.

The defendant did not testify at trial, but, in defense, presented the testimony of his third child, C.B., and Mr. O.E. Monnier, Jr.

C.B., who was fifteen years old at the time of the trial, testified her father was, at that time, living in Raceland. She agreed the house was "messy," and in disrepair, but stated that is where he lived. The last time she could recall staying there was in 2012. C.B. did not know the specific times her father traveled for military service, but remembered them. When asked if her father ever moved out of the Raceland house, she answered, "not a hundred percent, but I would say about – he didn't completely move out. He still would go back." She said the only time the Raceland house was "100 percent abandoned" was when her father was in Afghanistan. She explained that after his return, "He lived there for a little while but then he started staying at Monica's a little bit more and more."

C.B. recalled visiting her father at the Raceland house in 2015, but described being scared to go inside because it was not clean and might have had spiders. She confirmed some things kept in the house and on the six-acre property, stating cattle was currently kept in the pasture. She also recalled driving from Metairie to spend the day in Raceland cutting the grass, but could not give the exact timeframe. When asked if Monica went to Raceland much, she responded, "No." C.B. testified holidays with her father were spent in Metairie. She recalled bringing a friend to the Raceland house only once in 2015.

Mr. Monnier, a retired corporate executive, testified he had recently learned that he was identified as the complainant who filed the complaint against the defendant, but denied doing so. He explained he was a commissioner and one of the authors of the Home Rule Charter and that he maintained "a continuous dialogue" with the prior district attorney. Mr. Monnier recalled an informal

discussion with the district attorney about talk surrounding the defendant and references to the defendant as "the Jefferson parish councilman." However, he denied making a formal complaint about the defendant's 2015 notice of candidacy. Mr. Monnier further testified he had no knowledge of any efforts in the Council to remove or penalize the defendant for visiting his wife in Metairie. He also denied any knowledge of the sheriff's investigation. However, he acknowledged recently learning another complaining witness, described as the leader of those in the community voicing objections to the defendant's absence, had "an axe to grind" with the defendant.

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt. *State v. Taylor*, 97-2261 (La. App. 1 Cir. 9/25/98), 721 So. 2d 929, 932. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. *See State v. Moten*, 510 So. 2d 55, 61 (La. App. 1 Cir.), *writ denied*, 514 So. 2d 126 (La. 1987).

The defendant argues the state failed to prove he falsely represented his domicile on his notice of candidacy. He contends that while the state presented evidence he resided for a time in Metairie, the state failed to overcome the legal presumption that he intended to remain domiciled in Lafourche Parish. The defendant executed no express declaration of intent to change domicile and instead swore on his notice of candidacy that he was domiciled in Lafourche Parish. He

contends the state's evidence of time spent in Metairie does not establish, beyond a reasonable doubt, that he changed his domicile before filing his notice of candidacy in December 2015. He further points to the numerous vehicles registered to his Raceland address, to items of personal property kept there, to his registration to vote in Raceland, and to his homestead exemption there, which evidence his domicile was Lafourche Parish as he represented.

The state counters that the only evidence produced at trial to support the defendant's contention that he remained domiciled in Lafourche Parish was "self-serving" and insufficient to overcome the overwhelming circumstantial evidence of the defendant's intent to change his domicile to Jefferson Parish. The state reasons that the jury was presented with the defendant's contention that he had a presumption of continued domicile in Lafourche Parish, but reasonably rejected it when presented with the state's evidence.

The defendant's driver's license, voter registration, mailing address, and homestead exemption evidence proof the defendant considered Raceland, in Lafourche Parish, his primary residence, and further evidence proof of his intent to remain. The state's evidence that the defendant changed his domicile before filing his notice of candidacy consisted of proof the defendant spent time at his wife's home in Metairie, meaning he spent less time in Raceland than before their marriage; testimony of the defendant's ex-wife and children as to where they believed he lived; and testimony the defendant's Raceland home was in disrepair but livable. Even when viewed in the light most favorable to the state, the evidence falls short of proving beyond a reasonable doubt the falsity of the defendant's sworn statement that he was domiciled in Lafourche Parish. The state's evidence was inconclusive at best and was not dispositive of either the defendant's domicile or the defendant's intent regarding his domicile. Even a

person who does not spend a majority of his time at a particular address may still be domiciled there. *See Russell*, 780 So. 2d at 1052.

We are mindful that our role as a reviewing court is not to act as a thirteenth juror and substitute our judgment for that of the jury; however, under the facts of this case and considering the evidence presented, we conclude no rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.[3]   The *Jackson* standard does not permit jurors to speculate if the evidence is such that reasonable jurors must have reasonable doubt. *State v. Jones*, 16-1502 (La. 1/30/18), ___ So. 3d ___, ___ (2018WL618433, *3) (*per curiam*). Here, the evidence does not prove beyond a reasonable doubt that the defendant committed the charged crime. Accordingly, we reverse the defendant's conviction and vacate the sentence imposed.[4]

**CONVICTION REVERSED; SENTENCE VACATED.**

---

[3]   We note that based on the facts presented, this defendant would have clearly prevailed in a civil suit to disqualify him from candidacy. Finding the same facts support a finding in this criminal case of proof beyond a reasonable doubt that the defendant was not domiciled in his claimed parish would be anomalous and certainly chill the well documented policy of favoring candidacy set forth throughout this state's election jurisprudence. *See Landiak*, 899 So. 2d at 550.

[4]   Considering this, we pretermit discussion of the defendant's remaining assignments of error, but express serious questions about the admission of evidence involving events that occurred after December 2, 2015, the date of the alleged crime.

STATE OF LOUISIANA

VERSUS

JAMES BOURGEOIS

2019 KA 0426

FIRST CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

---

**WELCH, J., dissenting.**

I respectfully disagree with the majority's decision in this case. After a trial by jury, the jury found the defendant guilty as charged of filing or maintaining a false public record, a violation of La. R.S. 14:133. A conviction based on insufficient evidence cannot stand, as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. **Jackson v. Virginia,** 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979). See La. C.Cr.P. art. 821(B); **State v. Ordodi,** 2006-0207 (La. 11/29/06), 946 So. 2d 654, 660. The **Jackson** standard of review, incorporated in La. C.Cr.P. art. 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that, in order to convict, the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. See **State v. Patorno,** 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So. 2d 141, 144. When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from

the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. **State v. Forrest**, 2016-1678 (La. App. 1st Cir. 9/21/17), 231 So. 3d 865, 870, writ denied, 2017-1683 (La. 6/15/18), 257 So. 3d 687. The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. **State v. Folse**, 2018-0153 (La. App. 1st Cir. 9/21/18), 258 So. 3d 188, 195, writ denied, 2018-1743 (La. 4/22/19), 268 So. 3d 300. Unless there is internal contradiction or irreconcilable conflict with the physical evidence, the testimony of a single witness, if believed by the fact finder, is sufficient to support a factual conclusion. **State v. Marshall**, 2004-3139 (La. 11/29/06), 943 So. 2d 362, 369, cert. denied, 552 U.S. 905, 128 S. Ct. 239, 169 L. Ed. 2d 179 (2007); **State v. Howard**, 2018-0317 (La. App. 1st Cir. 9/21/18), 258 So. 3d 66, 76, writ denied, 2018-1650 (La. 5/6/19), 269 So. 3d 692.

An appellate court is constitutionally precluded from acting as a "'thirteenth juror' in assessing what weight to give evidence in criminal cases; that determination rests solely on the sound discretion of the trier of fact." **State v. Johnson**, 2010-0137 (La. App. 1st Cir. 12/22/10), 2010 WL 5464926, at *7 (unpublished). The fact the record contains evidence that conflicts with the testimony accepted by the trier of fact does not render the evidence accepted by the trier of fact insufficient. **State v. Morgan**, 2012-2060 (La. App. 1st Cir. 6/7/13), 119 So. 3d 817, 826. Additionally, the trier of fact's determination of the weight to be given evidence is not subject to appellate review. **State v. Duhon**, 2018-0593 (La. App. 1st Cir. 12/28/18), 270 So. 3d 597, 619, writ denied, 2019-0124 (La. 5/28/19), 273 So. 3d 315. Moreover, a court of appeal impinges on a fact finder's discretion more than is required to guarantee the fundamental protection of due process of law when it accepts a hypothesis of innocence that is not unreasonably

rejected by the fact finder. **State v. Mire**, 2014-2295 (La. 1/27/16), 269 So. 3d 698, 703 (*per curiam*).

To support a conviction for filing or maintaining false public records, the State must prove beyond a reasonable doubt defendant was responsible for filing or depositing for record with any public official, with knowledge of its falsity, any document containing a false statement or false representation of a material fact. See La. R.S. 14:133(A)(3). Moreover, La. R.S. 18:463(A) provided, in pertinent part, "[a] notice of candidacy shall be in writing and shall state the candidate's name, the office he seeks, the address of his domicile, and the parish, ward, and precinct where he is registered to vote."[1] (Emphasis added.) The instant notice of candidacy was a sworn statement.

The domicile of a natural person is the place of his habitual residence. La. C.C. art. 38. A natural person may reside in several places but may not have more than one domicile. La. C.C. art. 39. In the absence of habitual residence, any place of residence may be considered one's domicile at the option of persons whose interests are affected. La. C.C. art. 39. Domicile is maintained until acquisition of a new domicile. A natural person changes domicile when he moves his residence to another location with the intent to make that location his habitual residence. La. C.C. art. 44. Proof of one's intent to establish or change domicile depends on the circumstances. A sworn declaration of intent recorded in the parishes from which and to which he intends to move may be considered as evidence of intent. La. C.C. art. 45. Spouses may have either a common domicile or separate domiciles. La. C.C. art. 40.

---

[1] The version of La. R.S. 18:463 in effect on the date of the defendant's December 2, 2015 offense governs the applicable punishment for the crime. See **State v. Hyde**, 2007-1314 (La. 11/21/07), 968 So. 2d 726, 726. The Louisiana Legislature subsequently amended La. R.S. 18:463 after the date the defendant filed his notice of candidacy, but those amendments modified portions of La. R.S. 18:463 not applicable to the instant matter. See 2015 La. Acts 307, § 1 (eff. June 29, 2015); 2016 La. Acts 281, § 1 (eff. May 31, 2016); 2018 La. Acts 584, § 3 (eff. Jan. 1, 2019); 2019 La. Acts 374, § 1 (eff. June 19, 2019); 2019 La. Acts 374, § 2 (eff. Jan. 1, 2020).

A party seeking to show that a person's domicile has changed must overcome the legal presumption that it has not changed by positive and satisfactory proof of establishment of a domicile as a matter of fact with the intention of remaining in the new place and of abandoning the former domicile. **In re Succession of Cannata**, 2014-1546 (La. App. 1st Cir. 7/10/15), 180 So. 3d 355, 361, writ denied, 2015-1686 (La. 10/30/15), 180 So. 3d 303. Circumstances indicating establishment of a domicile include where a person sleeps, takes his meals, has established his household, and surrounds himself with his family and the comforts of domestic life. Relevant considerations include voter registration, homestead exemptions, vehicle registration records, driver's license address, statements in notarial acts, and evidence of where most of a persons' property is housed. **In re Succession of Cannata**, 180 So. 3d at 361.

Consequently, the issue before this court is whether the defendant, by his actions and words, intended to move his established domicile from Lafourche Parish to Jefferson Parish before December 2015, when he filed his application for election to the Lafourche Parish Council. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all of the evidence most favorable to the prosecution must be adopted. **State v. King**, 2017-0126 (La. App. 4th Cir. 10/27/17), 231 So. 3d 110, 118. Moreover, conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency. **State in Interest of T.C.**, 2018-1246 (La. App. 1st Cir. 12/21/18), 269 So. 3d 716, 719.

Defendant's children consistently testified that the defendant spent the preponderance of his time in Metairie. Defendant's son and his youngest daughter lived with the defendant and attended Catholic schools in Jefferson Parish from August 2015 to May 2018, and from August 2017 to May 2018, respectively. Those two children testified that the defendant nightly stayed with their stepmother in Metairie while they attended school in Jefferson Parish. Moreover, the

4

consensus among the defendant's children was that holidays with the defendant were spent in Metairie, not Raceland. Defendant's children, wife, and ex-wife all described the Raceland home as being in such poor condition as to be on the point of being uninhabitable.

Detective Nicholas Pepper of the Lafourche Parish Sheriff's Office investigated the complaint against the defendant on being assigned the case in August 2017. Det. Pepper testified that he observed a clear pattern of the defendant commuting into Lafourche Parish during the day and returning to Metairie in the evening for the period of August 2016 to August 2017, based on his review of data from license plate readers posted at the Lafourche parish line. Det. Pepper also reviewed reports of the utility usage at the defendant's Raceland home from 2014 to 2017. He testified that the electric usage at the Raceland home "dropped off considerably" about a month before the defendant's wedding to his second wife in April 2014. However, Det. Pepper noticed that from November 2015 to October 2016, water consumption at the Raceland home was "kind of off the charts," which suggested to him that the defendant was not present to notice a significant water leak at the home.

Lieutenant Benjamin Dempster, also with the Lafourche Parish Sheriff's Office, investigated a burglary at defendant's Raceland home in August 2015. Lt. Dempster testified that on interviewing the defendant about the burglary, the defendant stated that he had not been at the Raceland house in a long time and that he intended to demolish the house. Lt. Dempster observed that the house did not appear as if anyone was living in the home at the time of the burglary.

The defendant's Army Reserve service required him to be away from Raceland for recurring periods of time, but that alone does not entirely explain the lack of time spent in Raceland, nor his established pattern of entering the parish in the morning and leaving again in the afternoon. Moreover, the defendant's

5

behavior of "switching vehicles," wherein the defendant drove into Lafourche Parish in one vehicle, but later left the parish in another vehicle, as noticed by Det. Pepper, suggests a knowledge of wrongdoing. It is not unreasonable for a fact-finder to presume that had his relationship with his second wife not become estranged, the defendant would have remained living at the Metairie address indefinitely, while commuting into Lafourche Parish to take care of his business and property interests.

Defendant cites and relies on **Russell v. Goldsby**, 2000-2595 (La. 9/22/00), 780 So. 2d 1048 (*per curiam*) and **Autin v. Terrebonne**, 612 So. 2d 107 (La. App. 1st Cir.), writ denied, 604 So. 2d 954 (La. 1992) to support his assertion that the evidence was insufficient to prove he changed his domicile from Raceland to Metairie. Both of those cases were decided primarily on the expressed intent of the challenged party. See **Russell**, 780 So. 2d at 1051-52; **Autin**, 612 So. 2d at 110. But in more recent jurisprudence, the Louisiana Supreme Court has held:

> [D]etermination of a party's intent to change his or her domicile must be based on the actual state of the facts, not simply on what the person declares them to be. "The expressed intent of the party may be at variance with the intent as evidenced by conduct."
>
> ...
>
> Of course, because domicile and residence are two different legal concepts the facts could indicate that one has "abandoned the former domicile" in favor of a new domicile even if the person continues to have a place of residence at the former domicile.
>
> ...
>
> Since domicile is generally defined as residence plus intent to remain, a party's uncontroverted testimony regarding his intent may be sufficient to establish domicile, in the absence of any documentary or other objective evidence to the contrary. ... [I]n the absence of a formal declaration, when documentary or other objective evidence casts doubt on a person's statements regarding intent, it is incumbent on courts to weigh the evidence presented in order to determine domicile in fact.

> Otherwise, the legal concept of domicile is meaningless and every person would be considered legally domiciled wherever he says he is domiciled.

**Landiak v. Richmond**, 2005-0758 (La. 3/24/05), 899 So. 2d 535, 543 (citations omitted).

While the record shows the defendant and his family spent time at the Raceland address, and the defendant may have submitted a sworn statement indicating his intended domicile to be in Lafourche Parish, his actions indicated otherwise. Based on the totality of the evidence presented at trial—the testimony of his family members, combined with the observations of law enforcement—when viewed in the light most favorable to the prosecution, the State introduced sufficient evidence from which the trier of fact could reasonably conclude beyond a reasonable doubt that the defendant filed an affidavit falsely attesting that he was domiciled in Lafourche Parish. Compare **King**, 231 So. 3d at 117-20. For these reasons, I respectfully dissent.