# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #018

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **1st day of May, 2026** are as follows:

**BY Penzato, J.:**

*2025-K-00529*

*STATE OF LOUISIANA VS. DONALD BRIGGS, III A/K/A DONALD BRIGGS C/W STATE OF LOUISIANA VS. STEFAN JERMAINE BRIGGS (Parish of Vermilion)*

REVERSED AND REMANDED. SEE OPINION.

Griffin, J., dissents and assigns reasons.

Guidry, J., dissents and assigns reasons.

# SUPREME COURT OF LOUISIANA

## No. 2025-K-00529

## STATE OF LOUISIANA

## VS.

## DONALD BRIGGS, III A/K/A DONALD BRIGGS

## C/W

## STATE OF LOUISIANA

## VS.

## STEFAN JERMAINE BRIGGS

On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Vermilion

**PENZATO, Justice Pro Tempore**[1]

This case involves a drive-by shooting, which resulted in the death of Jazaylon Levy. A unanimous jury convicted brothers, Donald Briggs, III and Stefan Briggs, of second degree murder in connection with the shooting.

The Third Circuit Court of Appeal reversed defendants' convictions, concluding the evidence was insufficient because the State failed to exclude every reasonable hypothesis of innocence. Finding that the court of appeal erred in substituting its verdict for that of the jury, we reverse, reinstate defendants' convictions and sentences, and remand to the appellate court for consideration of the pretermitted assignments of error.

## FACTS AND PROCEDURAL HISTORY

Approximately a year-and-a-half before the murder of Mr. Levy, there was an eruption of gun violence between two rival groups in Abbeville, Louisiana. The Briggs brothers were affiliated with one group, while Ronald Bernard, III, was

---

[1] Judge Allison H. Penzato of the Court of Appeal, First Circuit, appointed Justice *pro tempore*, sitting for the vacancy in the First District.

1

affiliated with the other. In late 2020, Stefan was shot in two separate incidents. Mr. Bernard became a suspect, but police never confirmed his involvement in the shootings.

On the night of July 14, 2022, after 9:00 p.m., Mr. Levy was shot during a drive-by shooting in the parking lot of the Stone Bridge Apartment complex, located off Rodeo Road, in Abbeville. Mr. Levy, Gavin Garnica, a known associate of Bernard's group, and one other teenager were walking Kashawna Preston and her sister to their respective cars in the parking lot of the complex. As the group walked, Ms. Preston noticed a silver Mercedes-Benz backed into a parking space. Shortly after Ms. Preston and her sister departed in their vehicles, Mr. Levy was shot while standing near one of the empty parking spaces, a few parking spaces down from where Ms. Preston observed the silver Mercedes-Benz.

Detective Lon Hargrave, a courtesy officer who resided at Stone Bridge and worked with the Vermillion Parish Sheriff's Office SWAT team, treated Mr. Levy at the scene. Mr. Levy and Mr. Garnica were later transported to the hospital, where Mr. Levy expired from his injuries. While at the hospital, Mr. Garnica was apprehended on other charges and interviewed by Detective Hargrave. At that time, Mr. Garnica relayed that he sustained a gunshot graze wound to the leg. Mr. Garnica further admitted that he was "out there 'when them boys started shooting.'" Otherwise, he was uncooperative with the investigation.

Detective Trent Guidry, the Abbeville Police Department lead investigator, retrieved video surveillance from a Walmart store located one half mile from Stone Bridge. At 9:15 p.m., prior to the shooting, defendants exit a light-colored sedan and enter Walmart. After leaving Walmart, defendants' vehicle turns onto Rodeo Road in the direction of Stone Bridge. Thereafter, a light-colored sedan, consistent with defendants' sedan, enters Stone Bridge. Between nine to eleven minutes later, video footage of a Stone Bridge exit driveway captures audio of ten gunshots being

fired. Video footage from a neighboring apartment complex shows a light-colored sedan overtaking a white Ford F-150 truck and another vehicle[2] leaving Stone Bridge shortly after the shooting. Almost immediately after the sedan exited the complex, video surveillance from a Motel 6 records a light-colored sedan traveling eastbound on Highway 14. Subsequent footage from a Texaco station located at the intersection of Highways 14 and 89, in Delacambre, depicts a Toyota Camry followed by a light-colored Mercedes-Benz arriving at the station. Donald Briggs exits the Mercedes and enters the Camry, while Stefan exits the passenger side of the Mercedes, enters its driver's side, and drives away.

At the conclusion of the investigation, defendants were charged by grand jury indictment with the second degree murder of Mr. Levy. The defendants were tried together, and a unanimous jury found both defendants guilty as charged. Thereafter, defendants received life sentences at hard labor without the benefit of parole, probation, or suspension of sentence.[3] After the trial court denied post-verdict motions, defendants appealed.

On appeal, defendants each asserted three assignments of error, one of which pertained to the sufficiency of the evidence. After consolidating defendants' separate appeals, the appellate court concluded that the evidence was insufficient to convict defendants of second degree murder and reversed the jury verdict.[4] The court of appeal reasoned that because the evidence was circumstantial, the State was required, but failed, to negate every reasonable hypothesis of misidentification,

---

[2] Neither the State nor the defendants submit that the shooting could have come from this third vehicle, which, according to Detective Hargrave, was already visible in the driveway when the shots were fired.

[3] The appellate court noted the same patent error in each of defendant's sentences, which ordered defendants' sentences to run concurrently to any other sentence absent such a statement in the transcript. However, given it reversed the conviction and vacated the sentence, it found the errors patent to be moot.

[4] The court of appeal pretermitted defendants' remaining assignments of error, deeming them moot.

finding: "[e]ven if the jury reasonably inferred from the video evidence that the brothers were in the vicinity of the shooting at the time of the shooting and left shortly afterwards, the jury was required to speculate as to whether the shots were fired from the brothers' car." The court noted the lack of any evidence connecting defendants to the shooting or the victim, and the "ambiguous" evidence connecting them to Mr. Garnica, who was wounded in the shooting which killed Mr. Levy. Thus, the court concluded the jury's determination was based on speculation rather than reasonable inferences. The appellate court further found that the evidence was insufficient to prove Donald Briggs, the driver of the Mercedes, possessed specific intent to kill.

We granted the State's writ application to review the correctness of the appellate court's decision. *State v. Briggs*, 2025-00529 (La. 10/1/25), 420 So.3d 22.

**LAW AND DISCUSSION**

The sole issue presented is whether the evidence was sufficient to support defendants' convictions. The State asserts that the appellate court erred in finding it did not negate every reasonable hypothesis of misidentification or prove Donald's specific intent to kill. In particular, the State contends that the appellate court improperly weighed the evidence and substituted its own judgment for that of the jury. We agree.

Appellate review for constitutional sufficiency of evidence is limited by the due process standard of *Jackson v. Virginia*. *See State v. Rosiere*, 488 So.2d 965, 968 (La. 1986). Under that standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable

4

doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).[5]

Donald is alleged to have participated solely as the driver of the vehicle, not as the individual who shot Mr. Levy. Although not included in the jury instructions,[6] our statutory scheme recognizes that an individual who did not personally discharge a weapon may nevertheless be held liable as a principal. Under La. R.S. 14:24, "principals" encompass:

> All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

Here, the charged crime is second degree murder, which is defined, in part, as "the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm[.]" La. R.S. 14:30.1(A)(1). Thus, the State was required to prove that defendants killed Mr. Levy "with specific intent to kill or to inflict great bodily harm[.]" In order to prove defendants guilty *as principals* to second degree murder, the State was required to prove defendants either directly committed or

---

[5] Regarding appellate review under the *Jackson v. Virginia* standard, the United States Supreme Court has emphasized:

> Sufficiency review essentially addresses whether "the government's case was so lacking that it should not have even been submitted to the jury." On sufficiency review, a reviewing court makes a limited inquiry tailored to ensure that a defendant receives the minimum that due process requires: a "meaningful opportunity to defend" against the charge against him and a jury finding of guilt "beyond a reasonable doubt." The reviewing court considers only the "legal" question "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." **That limited review does not intrude on the jury's role "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."**

*Musacchio v. United States*, 577 U.S. 237, 243, 136 S.Ct. 709, 715, 193 L.Ed.2d 639 (2016) (internal citations omitted) (emphasis added).

[6] The parties did not challenge the jury instructions.

aided or abetted in the killing of Mr. Levy when each had a specific intent to kill or to inflict great bodily harm.[7]

Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Because specific intent is a state of mind, it need not be proven as a fact but may be inferred from the circumstances of the transaction and the actions of the defendant. *State v. Graham,* 420 So.2d 1126, 1127 (La. 1982).

Guided by these principles, and following a thorough review of the record, we conclude the State presented sufficient evidence of specific intent and negated the defense's hypothesis of misidentification. Detective Guidry testified that defendants harbored a vendetta against a rival group. Mr. Bernard, who was affiliated with the rival group, became a suspect in two shootings targeting Stefan Briggs. Mr. Garnica, who was also associated with this rival group, was rumored to be staying in the 300 building of Stone Bridge. In September 2020, Stefan was shot in the hand while he and Donald were traveling in a vehicle. Thereafter, Donald dropped Stefan off at the hospital and pursued the shooter. Detective Guidry stated that Stefan was uncooperative during the investigation of that shooting. He opined that, in his experience, a victim's lack of cooperation usually signals "potential retaliation." While the police never positively identified a shooter, Mr. Bernard was a suspect.[8] Detective Guidry further related that Mr. Bernard's father was killed in his driveway in November 2020, and that the evidence indicated that there were two shooters.

---

[7] Not all principals are automatically guilty of the same grade of offense as the main offender because the mental state of the offenders may be different. *State v. Brooks,* 505 So.2d 714 (La. 1987), *cert. denied,* 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). "Thus, an individual may only be convicted as a principal for those crimes which he personally has the requisite mental state." *Id.*, 505 So.2d at 717. The intent of the accomplice cannot be inferred to the accused. *State v. Holmes,* 388 So.2d 722 (La. 1980).

[8] On cross-examination, Detective Guidry admitted that the police never confirmed Mr. Bernard shot Stefan.

6

Detective Guidry also described another shooting incident in December 2020, wherein Stefan sustained a gunshot wound to the face while he and Donald were traveling in a vehicle. Stefan, whose facial scar was visible in court, was, again, uncooperative with that investigation. Additionally, Detective Guidry testified that he learned there was an altercation between Stefan and another associate of Mr. Bernard, while Stefan was in jail.

In addition, Detective Guidry testified relative to the video surveillance he reviewed in connection with his investigation. While the video footage was played for the jury, he described what he observed. In particular, Detective Guidry explained that, first, a light-colored sedan enters the parking lot of a Walmart store, which was directly adjacent to Stone Bridge. Then, two individuals — one wearing a white shirt and one wearing a black shirt — exit the vehicle and enter Walmart at 9:15 p.m.[9] He identified Donald Briggs, III as the individual in the white shirt and Stefan Briggs as the individual in the black shirt. The brothers walk around Walmart, without making a purchase, then return to the sedan, at which time Donald entered the driver's seat and Stefan the passenger's seat. The sedan exits the parking lot and turns on Rodeo Road heading toward Stone Bridge.

Next, Detective Guidry described a light-colored sedan entering Stone Bridge, as revealed from the video footage from the entrance of the complex.[10] Nine to eleven minutes after the sedan enters the complex, Stone Bridge's exit camera records audio of ten gunshots.

Significantly, immediately prior to the shooting, Ms. Preston walked to her car with a group of people, including Mr. Levy and Mr. Garnica. She testified she noticed a silver Mercedes-Benz backed into a parking space, and identified its location as only a few parking spaces down from where the shooting occurred. She

_____

[9] Detective Guidry verified the time-stamp from the Walmart footage was accurate.

[10] Detective Guidry stated that the time-stamp on the footage from the entrance was not accurate.

stated she was "positive" that it was a Mercedes and that she could clearly see it. She revealed the vehicle was turned off and she did not see anyone inside. After leaving the apartment complex and only traveling to the gas station right down the street, Ms. Preston learned of the shooting and returned to the scene.

After the shooting, surveillance video from the neighboring complex, the Havens, captures a light-colored sedan overtake a Ford F-150 truck, and another vehicle, as it travels through the exit of Stone Bridge toward Rodeo Road. Detective Guidry further reviewed footage from a Motel 6, which reveals a light-colored sedan traveling eastbound on Highway 14 in the direction of the Texaco station on Highway 14 "almost immediately" after the light-colored sedan exits Stone Bridge.

Finally, footage from the Texaco station, located on Highway 14 in Delacambre, records a light-colored Mercedes-Benz entering the station, wherein two individuals exit the vehicle.[11] Detective Guidry identified Donald exiting the driver's seat and Stefan walking around from the passenger's seat to the driver's seat. Donald enters a neighboring Toyota Camry, driven by his girlfriend, Nyesha Mouton. The vehicles later depart in opposite directions.

The State also admitted a photograph, confirmed by Detective Guidry to be the silver Mercedes driven by Donald on the night of the murder. Notably, the vehicle is consistent in appearance with the light-colored silver sedan observed by Detective Guidry in the video footage.

In connection with the meeting at the Texaco station, Ms. Mouton testified that she drove the brown Toyota Camry to the gas station. Initially, Donald asked

---

[11] On cross-examination, Detective Guidry acknowledged that the Texaco video did not have a time or date stamp. However, on re-direct, he stated when he originally viewed the footage at the Texaco station, there was a time stamp that he used to establish a timeline of events. He further recreated the route and confirmed it took him roughly the same amount of time as the light-colored sedan to exit Stone Bridge and arrive at the Texaco station. Specifically, approximately ten to eleven minutes elapsed between the sound of the gunshots and the arrival of the light-colored sedan at the Texaco station. Similarly, approximately nine-and-a-half minutes elapsed when he drove the route from Stone Bridge to the Delacambre Bridge, which was a quarter of a mile to a half mile away from the Texaco station.

8

her to meet him at a furniture store but, later, changed the location to the gas station. She confirmed Donald arrived in a silver Mercedes with Stefan in the vehicle. She stated that when Donald entered her vehicle, he was "upset, talking to himself" for about twenty-minutes. She stated that they drove to IHOP in Lafayette, and afterward she dropped Donald off at Willowind Apartments, where his cousin lived. She testified that Donald did not speak to her in the car.

Detective Hargrave, who heard the gunshots while taking out his trash, conducted an on-scene investigation after the shooting. He testified that based on his experience and training, he believed the ten gunshots came from one vehicle traveling at a moderate, constant speed. He further stated it was rumored that Mr. Garnica was staying in Apartment 322 in Stone Bridge. After the shooting, Mr. Garnica relayed to Detective Hargrave that he was "out there 'when them boys started shooting[,]'" and he received a graze wound to his leg. Otherwise, Mr. Garnica refused to cooperate with the investigation.

Dr. Christopher Tape, an expert in the field of forensic pathology, performed the autopsy, identifying a single, fatal gunshot wound to Mr. Levy's right buttock. He concluded that the bullet entry, which proceeded in a level trajectory through the pelvic/hip area, was around three to four feet (36-48 inches) from the ground, about half of Mr. Levy's height (35.5 inches) from the ground.

In connection with the only two vehicles recorded leaving the complex at the time of the shooting,[12] Detective Hargrave further testified that he reviewed the video surveillance and measured the windowsills of the light-colored sedan and the Ford F-150. Specifically, he measured multiple models of F-150 trucks and concluded the average height of the windowsill was anywhere from 52-57 inches (approximately 4 ½ feet). By contrast, the windowsill of defendants' vehicle, a

---

[12] As already discussed, Detective Hargrave ruled out a third exiting vehicle, because it was already visible in the video footage of the exit driveway during the shooting.

2009 Mercedes-Benz C300, measured around 37 inches (between 3-4 feet). Finally, when questioned about whether a vehicle that remained at the scene, rather than ones that exited the complex, could have been responsible for the shooting, he acknowledged that other vehicles were in the general area, but "he did not see the ability for any other vehicle that was currently parked there to have been involved in the shooting."

Based on the evidence presented at trial, the jury rationally found that defendants were active principals in the killing of Mr. Levy and possessed the requisite specific intent to kill. The evidence further supports the jury's reasonable inference that Donald as the driver, and Stefan as the shooter, directly committed, or aided and abetted in, the killing: they drove to and waited at the crime scene for their intended victim and executed a drive-by-shooting firing ten shots at three people, intending to hit Mr. Garnica. Deliberately aiming and firing a weapon at close range suffices to establish specific intent. *State v. Tassin*, 536 So.2d 402, 411 (La. 1988). The doctrine of transferred intent provides that when a person intends to kill or inflict harm upon another but instead kills or injures a third person, the law considers the actor just as guilty as if he had actually killed or injured his intended victim. *See State v. Tyler*, 342 So.2d 574 (La. 1977), *cert. denied*, 431 U.S. 917, 97 S.Ct. 2180 (1977) (shooting indiscriminately into a crowd with the intent to kill someone constitutes an assault with intent to kill upon each person in the crowd); *State v. Jordan*, 1997-1756, pp. 18-19, (La. App. 4 Cir. 9/16/98), 719 So.2d 556, 568 (intentionally firing into an area where children are playing, killing 12-year-old bystander, supports verdict for first degree murder and life sentence for drive-by shooter); *State v. Jasper*, 28,187, p. 18 (La. App. 2 Cir. 6/26/96), 677 So.2d 553, 566-567 (bystander killed when defendant and cohorts shot at car containing person who murdered defendant's relative; charge on transferred intent proper). For

10

these reasons, we find the appellate court erred in finding the evidence was insufficient to prove Donald had the requisite specific intent to kill.[13]

Nevertheless, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. *State v. Hughes*, 2005-0992, p. 5 (La. 11/29/06), 943 So.2d 1047, 1051.

Here, the State's case rested largely on circumstantial evidence. Circumstantial evidence is "evidence of one fact, or a set of facts, from which the existence of the fact to be determined may reasonably be inferred." *State v. Chism*, 436 So.2d 464, 468 (La. 1983). When circumstantial evidence forms the basis of the conviction, "the evidence, assuming every fact to be proved that the evidence tends to prove, in order to convict, [the circumstantial evidence] must exclude every reasonable hypothesis of innocence." La. R.S. 15:438; *State v. Toups*, 2001-1875, p. 3 (La. 10/15/02), 833 So.2d 910, 912 (La. R.S. 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt formula; rather it serves as a helpful evidentiary guide for jurors).

The *Jackson* standard "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 566 U.S. 650, 655, 132 S.Ct. 2060, 2064, 182 L.Ed.2d 978 (2012). Importantly, the *Jackson* due process standard does not allow a jury to speculate on the probabilities of guilt where rational jurors would necessarily entertain a reasonable doubt. *State v. Mussall*, 523 So.2d 1305, 1311 (La. 1988). The requirement that jurors reasonably reject the hypothesis of innocence advanced by the defendant in a case of circumstantial evidence presupposes that a rational

---

[13] Notably, defendants were tried under La. R.S. 14:30.1(A)(1), which requires proof of specific intent to kill, rather than (A)(2), which does not require proof of specific intent when a killing occurs during the course of enumerated felonies, including assault by drive-by shooting.

rejection of that hypothesis is based on the evidence presented, not mere speculation. *State v. Quinn*, 2019-0647, p. 7 (La. 9/9/20), 340 So.3d 829, 834 (citation omitted).

Summarily stated, the jury is the ultimate factfinder of whether a defendant presented a reasonable hypothesis of innocence and the state negated that hypothesis. *See* La. R.S. 15:438; and *State v. Mitchell*, 1999-3342 (La. 10/17/00), 772 So.2d 78. The reviewing court "must not impinge on the jury's factfinding prerogative in a criminal case except to the extent necessary to guarantee constitutional due process." *Mitchell*, 772 So.2d at 83.

The court of appeal concluded that the jury could only speculate the shots were fired from defendants' vehicle, thus the State did not negate any reasonable probability of misidentification. In support of its theory of misidentification, the defense presented two hypotheses: 1) the Ford F-150 truck also seen leaving after the shooting fired the shots; or 2) another vehicle fired the shots and parked in the complex to avoid detection.

Both of these arguments were made to the jury. Relying on Detective Hargrave's and Dr. Tape's testimony, the jury rejected the defense's theory that the shots came from the F-150 or another vehicle which was parked elsewhere in the complex after the shooting. As to the F-150, there was some potentially conflicting testimony regarding where the bullet would have hit a person of Mr. Levy's height, 5'11" (71 inches), based on Detective Hargrave's 6'2" height. However, direct evidence from Dr. Tape revealed that the bullet, which traveled in a level trajectory, created a wound that was approximately three to four feet from the ground, which was about half of Mr. Levy's height (35.5 inches). The windowsill of the F-150 measured around four-and-a-half feet (52-57 inches) from the ground, several inches higher than Mr. Levy's wound. This evidence is inconsistent with the perpetrator shooting from the window of the F-150 truck, as the bullet would have traveled in a downward trajectory. Meanwhile, the evidence is consistent with the perpetrator

12

having shot from the window of a Mercedes, which measures approximately three feet (37 inches), traveling in an even trajectory, and hitting Mr. Levy in the right buttock between three and four feet above the ground.

Furthermore, the video footage captures the light-colored sedan bypassing the F-150 to exit the complex just after the shooting. From this footage, the jury could have attributed the shooting to the occupants of the sedan, accepting the State's suggestion that the sedan hurriedly escaped to avoid detection, over the defense's suggestion that the sedan was simply leaving for safety reasons after hearing the gunshots. Based on this evidence, the jury was free to reject the defense's theory that an occupant of the F-150 truck was responsible for the shooting.

The jury further rejected the defense's hypothesis that a different vehicle was responsible for the drive-by shooting; however, instead of leaving the scene, it remained parked in the complex just after the shooting occurred. Again, the jury relied on the video surveillance of the light-colored sedan hurriedly overtaking two vehicles after the shooting, and Detective Hargrave's testimony that he did not believe another vehicle parked in the parking lot could have been involved in the shooting. The hypothesis of innocence offered by a defendant to overcome circumstantial evidence must be a reasonable one. *Hughes*, *supra*. In rejecting this theory, the jury apparently did not find it reasonable that perpetrators of a drive-by shooting would park in the vicinity of the shooting, risking retaliation or apprehension.

A reviewing court cannot assume a reasonable alternative hypothesis exists where the jury has heard and accepted evidence of specific intent to kill and identification that negates the defense's hypothesis. "The actual trier of fact's rational credibility calls, evidence weighing, and inference drawing are preserved … by the admonition that the sufficiency inquiry does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable

13

doubt." *Mussall*, 523 So.2d at 1311. The reviewing court is not called upon to determine whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. *Id*. Rather, the court must assure that the jurors did not speculate where the evidence is such that reasonable jurors must have a reasonable doubt. *Id*. (citing 2 C. Wright, Federal Practice and Procedure, Criminal 2d, § 467, at 465-466 (1982)). The reviewing court cannot substitute its idea of what the verdict should be for that of the jury. *Id*. Finally, the "appellate court is constitutionally precluded from acting as a 'thirteenth juror' in assessing what weight to give evidence in criminal cases; that determination rests solely on the sound discretion of the trier of fact." *State v. Mitchell*, 1999-3342, p. 8 (La. 10/17/00), 772 So.2d 78, 83 (quotation omitted).

Here, defendant does not identify any reasonable hypothesis remaining after the evidence is viewed in the light most favorable to the prosecution. The jury rejected the defense's hypotheses that an occupant of another vehicle was responsible for the shooting based on the evidence presented by the State in response to the defense's theories of innocence. The court of appeal departed from the *Jackson v. Virginia* standard, substituting its judgment for that of the jury, when it found an otherwise unspecified reasonable hypothesis of innocence remained. Simply because there was no eyewitness testimony as to the shooting, jurors were not foreclosed from reasonably inferring from the circumstantial evidence that defendants, acting in concert, entered the apartment complex after leaving Walmart; backed up into a parking spot in the parking lot waiting for Mr. Garnica due to his association with the rival group; within ten minutes of entering, shot and killed Mr. Levy in a drive-by shooting targeting Mr. Garnica; and drove to the Texaco station to separate. The undisputed animus between the rival groups provides the backdrop to the element of intent. Moreover, there is a direct temporal relationship between

14

defendants' coordinated movements before, during, and after the shooting, which strongly supports the jury's inferences.

In reaching the conclusion that the jury should have had reasonable doubt concerning defendants' identification as the shooters and Donald Briggs' specific intent to kill, we find the appellate court impermissibly substituted its own judgment for that of the jury. The collaborative and meticulous police work presented by the State provided a coherent narrative found compelling by the jury. On review of the record, we find that the jury's determination was certainly supported.

**CONCLUSION**

Viewing the evidence in the light most favorable to the prosecution, we find a rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that defendants were guilty of second degree murder of Mr. Levy. For these reasons, the judgment of the court of appeal is reversed. Defendants' convictions and sentences are reinstated, and the case is remanded to the Third Circuit Court of Appeal to address defendants' remaining assignments of error.

**REVERSED AND REMANDED**

15

# SUPREME COURT OF LOUISIANA

## No. 2025-K-00529

## STATE OF LOUISIANA

## VS.

## DONALD BRIGGS, III A/K/A DONALD BRIGGS

## C/W

## STATE OF LOUISIANA

## VS.

## STEFAN JERMAINE BRIGGS

On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Vermilion

**GRIFFIN, J., dissents and assigns reasons.**

Despite the testimony of the detective and the witness present on the day of the incident, there is no concrete evidence establishing that the defendants either drove the vehicle involved in the drive-by shooting or discharged any firearm. The jury's determination rests on speculation and does not rise to the level of reasonable inference required to exclude every reasonable hypothesis of innocence. *See* La. R.S. 15:438; *State v. Toups*, 01-1875, p. 3 (La. 10/15/02), 833 So.2d 910, 912.

The conclusion that the defendants acted in retaliation based on prior exposure to gang violence and related injuries is unsupported. This is especially true because the witness was unable to identify either defendant as the driver or shooter and because there was no definitive evidence which tied the defendants to the specific vehicle or license plate involved. Such speculation is insufficient to sustain a conviction for second degree murder. While circumstantial evidence may support a conviction, it must do so by leading to a fair and reasonable conclusion of guilt. Here, it fails to meet that standard.

The due process principles articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), do not permit a jury to base the finding of guilt on mere probabilities where rational jurors would necessarily entertain a reasonable doubt. *See State v. Mussall*, 523 So.2d 1305, 1311 (La. 1988). Accordingly, the evidence presented by the State is insufficient to support the conviction.

I respectfully dissent.

# SUPREME COURT OF LOUISIANA

## No. 2025-K-00529

## STATE OF LOUISIANA

## VS.

## DONALD BRIGGS, III A/K/A DONALD BRIGGS

## C/W

## STATE OF LOUISIANA

## VS.

## STEFAN JERMAINE BRIGGS

On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Vermilion

**GUIDRY, J.**, dissents and assigns reasons.

A conviction based on insufficient evidence cannot stand as it violates due process. *See* U.S. Const. amend. XIV; La. Const. art. 1, § 2. While the *Jackson* standard leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors draw reasonable inferences from basic facts to ultimate facts, *see Coleman v. Johnson*, 566 U.S. 650, 655, 132 S.Ct. 2060, 2064, 182 L.Ed.2d 978 (2012), importantly, the *Jackson* standard does not allow a jury to speculate on the probabilities of guilt where rational jurors would necessarily entertain a reasonable doubt. *See State v. Mussall*, 523 So.2d 1305, 1311 (La. 1988). Further, when circumstantial evidence forms the basis of the conviction, La. R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. *State v. Toups*, 01-1875, p. 3 (La. 10/15/02), 833 So.2d 910, 912. That jurors reasonably reject the hypothesis of innocence advanced by the defendant in a case of circumstantial evidence presupposes that a rational rejection of that hypothesis is based on the evidence presented, not mere speculation. *State v.*

*Quinn*, 19-0647, p. 7 (La. 9/9/20), 340 So.3d 829, 834, citing *State v. Schwander*, 345 So.2d 1173, 1175 (La. 1977).

Applying these precepts to the present matter, I would conclude that no rational trier of fact, even after viewing the evidence in the light most favorable to the prosecution, could find the evidence established the essential elements necessary to support the defendants' convictions. That is, no rational trier of fact could conclude, beyond a reasonable doubt, that the defendants had any involvement in the shooting herein, and thus, were guilty of second degree murder. Most starkly in this case, there is no evidence tying the defendants to the actual shooting, and no evidence tying the defendants to the victim, Mr. Levy. Even if the trier of fact reasonably inferred from the evidence that the defendants were in the vicinity of the shooting at the time it occurred and left quickly thereafter, the trier of fact was required to speculate as to whether the defendants were at the actual scene of the crime and in the vehicle from which the shots were fired.

No evidence places the defendants specifically at the scene of the shooting. While the basic facts establish that an *unoccupied* silver Mercedes Benz was backed into a parking space prior to the shooting, according to the witness testimony, that Mercedes Benz "was turned off," and the witness did not see anyone inside the vehicle. A rational trier of fact is bound to have reasonable doubt given the lack of corroboration in this case.[1] The fact that several individuals were outside, on the scene prior to the shooting, but did not see the defendants enter the scene with their vehicle, park the vehicle, exit any vehicle, or reenter any vehicle, from my view, further contributes to the creation of a reasonable doubt in the mind of any rational trier of fact. Not to mention that the State produced no evidence to demonstrate the defendants knew of any alleged target's whereabouts and that the target would be

---

[1] In addition, there is no evidence of a weapon, and no weapon was observed on either defendant in any of the video footage.

2

outside when defendants arrived on the scene. *See State v. Mussall*, 523 So.2d at 1311 (concluding that "unusual coincidences" and "lack of corroboration" can create reasonable doubt).

The court is not to substitute its judgment for that of the jury, but at the same time, the jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have a reasonable doubt.[2] I would find the circumstantial evidence in this case insufficient, failing to exclude every reasonable hypothesis of innocence. The determination that defendants were involved in a drive-by shooting was based upon speculation rather than reasonable inferences. In order for a jury's inferences to be permissible, they must flow from facts and circumstances proven in the record that are of such volume and quality as to overcome the presumption of innocence. *Coleman v. Johnson*, 566 U.S. at 655, 132 S.Ct. at 2064. No such facts or circumstances are proven in the record here. I therefore dissent.

---

[2] I further note that "mere presence" at the scene is not enough to concern an individual in the crime. *See generally State v. Pierre*, 93-0893 (La. 1994), 631 So.2d 427, 428.

3